******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RICHARD ROLON
## (SC 20423)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Vertefeuille, Js.*

*Syllabus*

Convicted, on a conditional plea of nolo contendere, of the crime of possession of a controlled substance with intent to sell, the defendant appealed, claiming that the trial court improperly denied his motion to suppress certain evidence that was seized after the police detained him, without a warrant, in the parking lot of the apartment building in which his codefendant, E, lived. The police had obtained an arrest warrant for a suspected drug trafficker, R, and a search warrant for R's apartment, which was in the same building as E's apartment.. Prior to executing the warrants, the police were surveilling the parking lot when they observed an unknown male, later identified as the defendant, engage in a brief conversation with R. The defendant and R then got into their respective vehicles and departed. A short time later, R was arrested for selling narcotics to an undercover officer, and the police prepared to execute the search warrant for R's apartment. At that time, however, the defendant and E returned to the parking lot in the defendant's vehicle. Approximately four or five uniformed police officers, at least one of whom had his gun drawn, immediately approached the defendant's parked vehicle. Upon reaching the driver's door, one of the officers opened the door and detected the odor of marijuana. The officer also observed a marijuana cigarette and drug packaging inside the vehicle. Both the defendant and E were removed from the vehicle and placed into custody. The police subsequently obtained a search warrant for E's apartment, and that search yielded additional narcotics and other related evidence. The defendant moved to suppress the evidence seized by the police, claiming that the warrantless search and seizure of his person and vehicle violated his constitutional rights. The trial court denied the motion, concluding that the warrantless seizure fell within the exception to the fourth amendment warrant requirement that authorizes law enforcement officers executing a search warrant to detain the occupants of the premises while a proper search is conducted. On appeal from the judgment of conviction, the defendant claimed that the trial court improperly denied his motion to suppress because he was not an occupant or in the immediate vicinity of the premises to be searched within the meaning of that exception. *Held* that the trial court improperly denied the defendant's motion to suppress, the state having failed to satisfy its burden of establishing that the defendant was in the immediate vicinity of R's apartment when the defendant was detained by the police: the record was devoid of any evidence concerning the spatial factors used to ascertain whether the defendant was in the immediate vicinity of the premises to be searched, including whether the defendant was detained within the lawful limits of R's apartment, whether he was detained within the line of sight of R's apartment, and whether his location made it easy for him to enter or reenter R's apartment; accordingly, the warrantless search and seizure of the defendant and his vehicle were not justified under the relevant exception to the warrant requirement.

Argued June 5—officially released November 13, 2020**

*Procedural History*

Substitute information charging the defendant with the crimes of possession of a controlled substance with intent to sell, possession of a controlled substance, and operation of a drug factory, brought to the Superior Court in the judicial district of Hartford, where the court, *Gold, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the defendant was

presented to the court, *Baldini, J.*, on a conditional plea of nolo contendere to the charge of possession of a controlled substance with intent to sell; judgment of guilty in accordance with the plea; subsequently, the state entered a nolle prosequi as to the charges of possession of a controlled substance and operation of a drug factory, and the defendant appealed. *Reversed*; *further proceedings*.

*Ronald S. Johnson*, with whom was *Shawn Adams*, for the appellant (defendant).

*Sarah Hanna*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. The defendant, Richard Rolon, appeals from the judgment of conviction rendered by the trial court following his conditional plea of nolo contendere to the charge of possession of a controlled substance with intent to sell in violation of General Statutes § 21a-277 (a). The defendant claims that the trial court improperly denied his motion to suppress evidence seized after his warrantless detention in the parking lot of a multiunit apartment building, contending that he was not an "occupant" within the "immediate vicinity" of the premises subject to a search warrant under the exception to the fourth amendment's warrant requirement established in *Michigan* v. *Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981), and *Bailey* v. *United States*, 568 U.S. 186, 193, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013) (*Summers* exception). We agree and, therefore, reverse the judgment and remand the case to the trial court with direction to grant the defendant's motion to suppress.

The controlling facts are those found by the trial court following an evidentiary hearing on the defendant's motion to suppress. "Members of the Statewide Narcotics Task Force conducted a six week long investigation into the suspected narcotics trafficking of an individual named Richard Rivera . . . . During the course of that investigation, an undercover police officer made a number of controlled drug purchases from Rivera at his home located at apartment C-1 of 12-14 South Street, Hartford.[1] On the basis of that investigation, [the] police applied for and obtained a search warrant for Rivera's apartment, as well as arrest warrants for Rivera based on his prior sales of narcotics to the undercover officer.

"After securing these warrants, [the] police developed an operational plan for their coordinated execution. On the date the warrants would be served, the plan contemplated that [the] police would conduct surveillance of the driveway and parking area of 12-14 South Street, doing so by means of a city of Hartford street camera that [the] police could remotely access and direct toward the target location. This camera allowed [the] police from an off-site location to view via a live feed the events occurring in the targeted area. The plan also anticipated that an additional controlled purchase from Rivera would be arranged by the undercover officer, with that purchase to be conducted at a location some distance away from Rivera's South Street apartment. [The] [p]olice would be prepared to arrest Rivera when that sale was consummated and then to immediately execute the search warrant at his apartment. Between the officers assigned to surveillance, those responsible for the arrest of Rivera, and the members of the search warrant execution team, approximately twenty to thirty police officers were tasked with

carrying out the operational plan.

"On January 31, 2017, the police put their plan into effect. Consistent with that plan, officers established their street camera surveillance of the driveway and parking area of 12-14 South Street and monitored the activities occurring there from approximately 10 a.m. until noon.[2] At approximately 11:13 a.m., [officers] on the surveillance team saw a car enter the driveway of the target address and back into a parking space against a chain-link fence that separated 12-14 South Street from a neighboring parcel. The car was recognized by officers as one that Rivera or his criminal associates had been seen operating during the course of the police investigation.

"As the car was backing into the space, [the] police observed a man walk from the area of the rear entrance of 12-14 South Street toward the area in which Rivera's car had just parked. The man's identity was unknown to [the] police at the time, as he had not previously come to their attention during the course of their investigation into Rivera's activities. The man, who was subsequently identified as the defendant . . . walked past the driver's side door of Rivera's car and then out of view of the camera. As [the defendant] passed Rivera's car, [the] police saw the driver's door of the car open and a man emerge from the driver's seat. Upon exiting his vehicle, this man, who [the] police recognized and later confirmed was Rivera, stood just outside his car between the open door and the car itself. [The] [p]olice then observed Rivera begin to engage in a conversation with someone who was out of the camera's view. In order to determine the identity of the party with whom Rivera was conversing, [the] police slightly adjusted the direction of the camera. By doing so, [the] police were able to observe that the other party to this conversation was [the defendant], who was standing by the driver's door of a second car that was parked in the space next to Rivera's.[3] [Because] the surveillance camera did not have audio capability, [the] police were unable to overhear the content of the conversation.

"The conversation lasted approximately thirty seconds and appeared to end when Rivera, at approximately 11:14 a.m., sat back down in his driver's seat and closed his car door. As that occurred, a woman was seen walking from the rear of 12-14 South Street toward the area of Rivera's and [the defendant's] cars. This woman had not previously come to the attention of [the] police during their investigation into Rivera but was later identified as the [defendant's codefendant], Yashira [A.] Espino. As Espino approached the cars, [the] police observed [the defendant] reenter the camera's view, pass by Espino, and return to the rear entrance area of 12-14 South Street.

"Approximately [one] minute later, at 11:16 a.m., [the] police saw [the defendant] again leave the rear of 12-

14 South Street and walk back toward his car. Within seconds, [the] police observed [the defendant's] car, a dark Camry with New Jersey license plates, exit its parking space and proceed down the driveway toward South Street, passing the front of Rivera's parked car while doing so. As soon as [the defendant's] car passed Rivera's, [the] police saw Rivera pull his car out of its parking space and follow [the defendant's] car down the driveway. The positioning of the street camera did not allow [the] police to see the cars actually entering onto South Street.

"Approximately forty-five minutes later, and in accordance with the police operational plan, Rivera was arrested on Franklin Avenue after selling an additional quantity of narcotics to the undercover officer. Upon learning of Rivera's arrest, Detective [Sean] Mikeal, who was assigned to the search warrant execution team, drove immediately to the arrest location and retrieved Rivera's keys to apartment C-1 of 12-14 South Street . . . . Mikeal then returned to South Street and rejoined the other members of the search warrant execution team who were at that time staged in several vehicles in close proximity to the target address preparing to execute the search warrant at Rivera's apartment.

"As Mikeal and the other members of his team were about to drive their vehicles into the driveway of 12-14 South Street to commence the execution of the search warrant, [the defendant's] Camry was observed entering the driveway just ahead of them and then backing into the same space it had occupied earlier. The car's reappearance on the scene, particularly in the moments just before the warrant's execution, was entirely unexpected by [the] police. Even before any occupants of [the defendant's] car had exited it, the search warrant execution team members drove their vehicles into the driveway of 12-14 South Street. Approximately four or five officers, all of whom were wearing shirts or vests clearly identifying themselves as police officers, immediately exited their vehicle and approached [the defendant's] parked car—at least one of the officers doing so with [a] gun drawn. . . . Mikeal, who may or may not have had his gun drawn, went directly to the driver's side of [the defendant's] car. Trooper Dawn Pagan simultaneously approached the passenger side of the vehicle. These officers determined that the car was occupied by a male driver later identified as [the defendant], a female front seat passenger later identified as Espino, and a small child in the backseat.

"Upon reaching the driver's door, Mikeal opened the door and immediately detected the odor of marijuana coming from inside the vehicle. From his vantage point outside the vehicle, Mikeal also observed a marijuana cigarette in the car's center console and a number of white baggies in the area of the driver's side door handle—baggies he recognized to be of a type used for the

packaging of heroin. As Pagan reached the passenger's door, she, too, detected the odor of marijuana coming from the vehicle and observed a marijuana cigarette in the front center console area. Both [the defendant] and Espino were then removed from [the] vehicle and placed into custody. [They] later informed [the] police that Espino was the tenant in apartment C-2 of 12-14 South Street and that [the defendant] frequently resided with her at that address." (Footnote altered; footnotes in original; footnotes omitted.)

On the basis of the evidence obtained during the search and seizure of the defendant, Espino, and the defendant's motor vehicle, the police obtained a search warrant for Espino's apartment at C-2 of 12-14 South Street. During the execution of that search warrant, the police discovered more than 5000 bags of powdered heroin, approximately five ounces of marijuana, narcotics packaging materials, and more than $20,000 in cash.

The defendant was arrested and charged with (1) possession of a controlled substance with intent to sell in violation of § 21a-277 (a), (2) possession of a controlled substance or more than one-half ounce of marijuana in violation of General Statutes § 21a-279 (a) (1), and (3) operation of a drug factory in violation of § 21a-277 (c). The defendant and Espino both moved to suppress the evidence seized by the police, claiming that the warrantless seizure in the parking lot of 12-14 South Street violated their rights under the fourth amendment to the United States constitution and article first, §§ 7 and 9, of the Connecticut constitution because the police lacked a reasonable, articulable suspicion to believe that they were engaged in criminal activity.[4] The state opposed the motions. The state initially did not seek to justify the warrantless seizure under the *Summers* exception, which was the ground on which the trial court ultimately denied the motions to suppress. Instead, the state argued that the seizure was permissible under *Terry* v. *Ohio*, 392 U.S 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), because the police officers had a reasonable, articulable suspicion to believe that the defendant and Espino "may be returning to the scene in order to interfere with the execution of the search warrant [on apartment] C-1" in light of the defendant's brief conversation with Rivera in the parking lot of 12-14 South Street on the morning of January 31, 2017, and his return to the parking lot at the same "point [in] time officers were about to search [apartment] C-1" following Rivera's arrest.

The trial court conducted a joint evidentiary hearing on the motions to suppress, at which the state conceded that the defendant and Espino "were seized . . . when the police officers en masse approach[ed] [the defendant's] vehicle" because the "liberty [of their] movements" had been restricted. Thus, the sole question for the trial court was whether the warrantless seizure and

subsequent search of the defendant, Espino, and the defendant's motor vehicle fell within an applicable exception to the fourth amendment's warrant requirement. The state's argument was limited to two exceptions: *Terry* v. *Ohio*, supra, 392 U.S 21–22,[5] and the plain view doctrine. Specifically, the state argued that the initial investigatory detention of the defendant and Espino fell within the *Terry* exception because the police had a reasonable, articulable suspicion to believe that they were engaged in criminal activity. The subsequent search of the defendant, Espino, and the defendant's motor vehicle, the state argued, was justified by the plain view doctrine because the police observed drugs in plain view during the course of the investigatory detention.

During closing argument following the evidentiary hearing, the trial court asked the state whether the warrantless seizure fell within a third exception to the warrant requirement, namely, the *Summers* exception, "because that's not something [the state had] addressed." In response, the prosecutor explained that he "just [did not] think" that *Bailey* and *Summers* "appl[ied] to these facts." The trial court replied by observing that "*Bailey* and *Summers* would advantage the state because [the *Summers* exception] would allow a detention to take place even in the absence of [a] reasonable and articulable suspicion. So, if you're not pursuing that, then the only argument that would be for me to decide is whether . . . [a] reasonable and articulable suspicion existed." The prosecutor then stated that, "[c]ertainly, if the court feels that . . . that exception could apply to these facts then, you know, I'd be a fool not to ask the court to entertain it."

The trial court subsequently issued a written memorandum of decision in which it denied the motions to suppress. The trial court rejected the state's claim that the initial seizure was justified under the *Terry* doctrine, reasoning that neither the defendant nor Espino "had come to the attention of [the] police during any aspect of the Rivera investigation," and the "police observations of [their] activities" on January 31, 2017, alone, although sufficient to "[raise] investigative concerns in the minds of police officers," were insufficient to give the "police [a] reasonable and articulable suspicion specifically to believe that the [defendant and Espino] were engaged in or had been engaged in criminal activity." The trial court, however, did not stop there; it proceeded to decide that the warrantless seizure of the defendant and Espino was justified pursuant to the *Summers* exception—the legal theory belatedly raised by the trial court following the evidentiary hearing. In arriving at this conclusion, the trial court determined that the parking lot where the seizure occurred "fell within the 'immediate vicinity' of the premises that were to be searched [pursuant to the warrant], as that term was employed by the court in *Bailey* v. [*United States*],

supra, 568 U.S. 186." The trial court further determined that the defendant and Espino were " 'occupants' of the premises to be searched" because the police had "an articulable basis to connect [them] to the premises to be searched, or to the [resident] of [the] premises." In the trial court's view, the intrusion on the defendant's liberty was reasonable when weighed against the state's interest in promoting officer safety because the defendant's detention "was exceedingly brief in duration and no more intrusive than was necessary for [the] police to take command of the situation, to safely approach the [defendant's] vehicle, and then to confirm or dispel the validity of their suspicions." During the course of the seizure, "the officers detected the odor of marijuana emanating from the car and drugs in the car within plain view," which at that point provided them with "reasonable suspicion" under the *Terry* doctrine—if "not probable cause—to believe that the [defendant and Espino] were engaged in criminal activity . . . ." Accordingly, the trial court determined that no fourth amendment violation occurred in connection with either the warrantless seizure of the defendant and Espino or the subsequent, warrantless search of their persons and motor vehicle.

After the denial of his motion to suppress, the defendant entered a conditional plea of nolo contendere to the charge of possession of a controlled substance with intent to sell in violation of § 21a-277 (a), which was "conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress . . . ." General Statutes § 54-94a.[6] The state entered a nolle prosequi as to each of the two remaining charges. The trial court sentenced the defendant to fifteen years of imprisonment, execution suspended after eight years, followed by three years of probation. This appeal followed.[7]

On appeal, the defendant claims that the trial court improperly denied his motion to suppress because neither the defendant nor Espino was an "occupant" in the "immediate vicinity" of the premises to be searched under the *Summers* exception to the fourth amendment's warrant requirement.[8] Our standard of review for a motion to suppress is well settled. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and

whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). We exercise plenary review here because the defendant challenges the trial court's legal conclusion that its factual findings permit application of the *Summers* exception. See id.

The fourth amendment to the United States constitution, which applies to the states through the due process clause of the fourteenth amendment, prohibits unreasonable searches and seizures by government agents.[9] "Subject to a few well defined exceptions, a warrantless search and seizure is per se unreasonable." *State* v. *Eady*, 249 Conn. 431, 436, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999); accord *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see also *State* v. *Clark*, 255 Conn. 268, 291, 764 A.2d 1251 (2001). "The state bears the burden of proving that an exception to the warrant requirement applies when a warrantless search [and seizure have] been conducted." *State* v. *Clark*, supra, 291; accord *Mincey* v. *Arizona*, 437 U.S. 385, 390–91, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978).

We begin our analysis with *Michigan* v. *Summers*, supra, 452 U.S. 692, because the state relies solely on the fourth amendment exception created by that case to justify the initial warrantless seizure of the defendant.[10] In *Summers*, police officers encountered the defendant, George Summers, descending the front steps of his residence when they arrived at his house to execute a search warrant for narcotics. Id., 693. The officers detained Summers and requested his assistance in gaining entry to the residence. Id. "After finding narcotics in the basement and ascertaining that [Summers] owned the house, the police arrested him, searched his person, and found in his coat pocket an envelope containing 8.5 grams of heroin." Id. Summers "moved to suppress the heroin as the product of an illegal search in violation of the [f]ourth [a]mendment . . . ." (Footnote omitted.) Id., 694.

The United States Supreme Court held that Summers' limited detention for the duration of the execution of the search warrant was justified by the operative "law enforcement interest[s]" viewed in light of "the nature of the 'articulable facts' supporting the detention . . . ." Id., 702. The court explained that a limited detention attendant to the execution of a search warrant served the legitimate interests of "preventing flight in the event that incriminating evidence is found," "minimizing the risk of harm" to both "the police and the occupants" of the premises, and facilitating "the orderly completion of the search" by ensuring that the occupants of the premises are available to "open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay

the completion of the task at hand." Id., 702–703. As for "the nature of the 'articulable facts' supporting the detention"; id., 702; the court determined that the existence of a search warrant obtained from a "neutral and detached magistrate [who] had found probable cause to believe that the law was being violated in [the occupant's own] house"; id., 701; connects the occupant of the premises to criminal activity, thereby giving police officers "an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." Id., 704. Furthermore, the detention, "although admittedly a significant restraint on . . . liberty," is "less intrusive than the search itself," partly because it is in the occupant's "own residence" and does not involve the "inconvenience [or] the indignity" of a public arrest or "a compelled visit to the police station." Id., 701–702. Accordingly, "for [f]ourth [a]mendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (Footnote omitted.) Id., 705.

The United States Supreme Court imposed limits on the *Summers* exception in *Bailey* v. *United States*, supra, 568 U.S. 186, and explained that such limits were necessary particularly inasmuch as "[t]he rule in *Summers* extends further than some earlier exceptions [to the fourth amendment's warrant requirement] because it does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers. . . . An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." (Citation omitted; internal quotation marks omitted.) Id., 193; see also id., 200 ("[b]ecause this exception grants substantial authority to police officers to detain outside of the traditional rules of the [f]ourth [a]mendment, it must be circumscribed"). *Bailey* addressed whether the *Summers* exception applies to an occupant who is stopped and detained approximately one mile "away from the premises to be searched when the only justification for the detention [is] to ensure the safety and efficacy of the search." Id., 189–90. The court noted that, as a categorical and far-reaching "exception to the [f]ourth [a]mendment rule prohibiting detention absent probable cause," the scope of the *Summers* exception "must not diverge from its purpose and rationale." Id., 194. To determine the scope of the *Summers* exception, the court addressed whether "the reasons for the rule" support extending the *Summers* exception to a detention one mile away from the premises to be searched. Id.

The court in *Bailey* held that a detention incident to the execution of a search warrant is not constitutionally permissible under such circumstances because none of

the "three important law enforcement interests that, taken together justify" the *Summers* exception—namely, "officer safety, facilitating the completion of the search, and preventing flight"—weighed in favor of "extending the power to detain persons stopped or apprehended away from the premises where the search is being conducted." Id., 194–95. First, with respect to officer safety, persons who are not in the immediate vicinity of the premises to be searched "[pose] little risk to the officers at the scene." Id., 196. Although there is a "risk that a departing occupant might notice the police surveillance and alert others still inside the residence," this risk is "an insufficient safety rationale to justify expanding the existing categorical authority to detain so that it extends beyond the immediate vicinity of the premises to be searched." Id., 197. The court explained that, if the *Summers* rule extended to persons beyond the immediate vicinity of the premises to be searched, "the [safety] rationale would justify detaining anyone in the neighborhood who could alert occupants that the police are outside, all without individualized suspicion of criminal activity or connection to the residence to be searched. This possibility demonstrates why it is necessary to confine the *Summers* rule to those who are present when and where the search is being conducted." Id.

Second, the court in *Bailey* stated that the law enforcement interest in the orderly completion of the search "must be confined to those persons who are on site and so in a position, when detained, to at once observe the progression of the search"; otherwise, the *Summers* exception "would have no limiting principle . . . ." Id., 198. An individual who is not in the immediate vicinity of the premises at the time of the execution of the search warrant can "[serve] no purpose in ensuring the efficient completion of the search." Id.

Third, *Bailey* held that law enforcement's interest in preventing flight "does not independently justify detention of an occupant beyond the immediate vicinity of the premises to be searched" because this interest is limited to "the damage that potential flight can cause to the integrity of the search." Id., 199. "The need to prevent flight, if unbounded, might be used to argue for detention, while a search is underway, of any regular occupant regardless of his or her location at the time of the search. . . . The interest in preventing escape from [the] police cannot extend this far without undermining the usual rules for arrest based on probable cause or a brief stop for questioning under [the] standards derived from *Terry*. Even if the detention of a former occupant away from the premises could facilitate a later arrest should incriminating evidence be discovered, 'the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the [f]ourth [a]mendment.' " Id., quoting *Mincey v. Arizona*, supra, 437 U.S. 393.

*Bailey* also expressed concern about the extent of the constitutional deprivation that would occur if the *Summers* exception to the warrant requirement were to be extended beyond the immediate proximity of the search location. Not only are law enforcement's interests insufficient to justify "the detention of recent occupants beyond the immediate vicinity of the premises to be searched," the court explained, but the detention of an occupant "away from his home" introduces "an additional level of intrusiveness." *Bailey* v. *United States*, supra, 568 U.S. 199–200. "A public detention, even if merely incident to a search, will resemble a full-fledged arrest" and will expose the occupant to "the additional indignity of a compelled transfer back to the premises, giving all the appearances of an arrest." Id., 200. Such detentions are, therefore, "more severe"; id., 201; than a detention that "occurs in the individual's own home  . . . ." Id., 200.

In light of these considerations, the court in *Bailey* concluded that "[a] spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant." Id., 201. A warrantless detention one mile away from the premises is "beyond any reasonable understanding of the immediate vicinity of the premises in question," and the court therefore found no "necessity [or] . . . occasion to further define the meaning of immediate vicinity. In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." Id.

The present case is one of those "closer cases" that necessitates an examination of the *Bailey* factors—including whether the detention occurred within the lawful limits of the premises, in the line of sight of Rivera's apartment, and in a location that would facilitate the ease of reentry—to determine whether the defendant was within the "immediate vicinity" of the premises to be searched under the *Summers* exception.

At the outset, we address the defendant's argument that the *Summers* exception is inapplicable because he was not an "occupant" of the premises to be searched within the meaning of *Summers* and its progeny. The defendant argues that the use of the term "occupant" in *Summers* serves as a doctrinal limitation separate and distinct from the "immediate vicinity" requirement. According to the defendant, the state must prove not only that he was a person in the immediate vicinity of Rivera's apartment, but that he also was a *resident* of that apartment. The defendant's legal argument, if correct, would be dispositive because it is undisputed that the defendant was not a resident, lessee or owner

of Rivera's apartment; nor did he have a known connection to Rivera's apartment. For example, the police never observed the defendant entering or exiting the apartment; nor did they have any reason to believe that the defendant was a visitor—frequent or otherwise— to Rivera's apartment. The record reflects that, during the state's six week investigation into Rivera's suspected narcotics trafficking enterprise, neither the defendant nor Espino had ever come to the attention of the police. In support of his legal claim, the defendant relies on the literal language of *Summers*, which repeatedly uses the term "occupant" to describe those persons subject to the exception, as well as other sources of authority favoring a restrictive definition of "occupant," including the views of Professor Wayne R. LaFave[11] and this court's decision in *State* v. *Torres*, 197 Conn. 620, 625, 500 A.2d 1299 (1985), in which we questioned the applicability of the *Summers* exception.[12] The defendant's position is that *Summers* does not apply under these circumstances, regardless of his geographic location at the time of his detention.

The state takes a diametrically opposed view regarding the legal significance of the defendant's status as an occupant. The state argues that physical presence in the immediate vicinity of the premises to be searched, combined with a connection to a resident of the premises, is enough to satisfy the *Summers* occupancy requirement. According to the state, the defendant was an occupant of Rivera's apartment because he was in the immediate vicinity of the apartment and "the police possessed articulable facts connecting the defendant" to Rivera, which "necessarily also connected him to the premises subject to the search warrant." More broadly, the state contends that reasonableness is the touchstone of the fourth amendment and that reasonableness, rather than the artificial categories of occupancy or residency, must define the scope of the *Summers* exception. Thus, in the state's view, if a person in the immediate vicinity of the search poses a potential risk to an officer or public safety, or the orderly execution of the search warrant, then *Summers* permits the person to be detained for the purpose of safeguarding those interests.

The definition of the term "occupant" under *Summers* is a sharply contested legal issue of substantial interest,[13] but it is not one that we must resolve in this case because we conclude that the state failed to satisfy its unquestioned burden of establishing that the defendant—"occupant" or otherwise—was in the immediate vicinity of the premises to be searched at the time of his detention.

As we previously discussed, *Bailey* identifies three specific factors that will help determine whether the defendant was in the "immediate vicinity" of the premises to be searched for purposes of ascertaining the

applicability of the *Summers* exception: (1) whether the defendant was within the lawful limits of the premises; (2) whether the defendant was within the line of sight of the premises; and (3) whether the defendant's location was conducive to ease of reentry to the premises. *Bailey* v. *United States*, supra, 568 U.S. 201. We emphasize that these factors are neither talismanic nor exclusive in nature, and they should not be understood as anything more than a useful means to ascertain the answer to the underlying "immediate vicinity" question. Ultimately, the "immediate vicinity" inquiry asks whether the defendant's geographic proximity to the premises to be searched places him in a location where, absent detention, he poses a genuine danger to the safe and efficient execution of the search warrant.

There is no evidence in the record with respect to the first *Bailey* factor, namely, whether the defendant was detained within the "lawful limits of the premises . . . ." Id. The premises to be searched was a single apartment in a multiunit building comprised of approximately ten to twelve apartments. Even if we assume, without deciding, that the "lawful limits" of an apartment may include the interior and exterior common areas to which occupants of a multiunit building have legal access—a hallway, staircase, or even parking lot or other outside area in close proximity to the premises to be searched—the state failed in the present case to adduce sufficient evidence to support a reasonable inference that the parking lot of 12-14 South Street was an exterior common area for the use and benefit of the building's tenants. See, e.g., *United States* v. *Murray*, 659 Fed. Appx. 1023, 1027 (11th Cir. 2016) (driveway of property adjacent to premises to be searched was "beyond 'the lawful limits' "), cert. denied,    U.S.   , 137 S. Ct. 699, 196 L. Ed. 2d 575 (2017); *United States* v. *Jones*, 311 F. Supp. 3d 761, 767 (E.D. Va. 2018) (concluding that parking lot was within lawful limits of premises to be searched because "[t]he evidence . . . showed that the parking area [was] shared by all of the businesses in the office building"); *United States* v. *Ruiz*, Docket No. EP-14-CR-868-PRM, 2014 WL 10183873, *8 (W.D. Tex. August 25, 2014) (defendant's stop less than 130 yards from his apartment was not within lawful limits of premises). For example, there was no evidence that the tenants of 12-14 South Street had parking privileges in the lot in which the defendant was detained under the terms of a lease agreement or otherwise. Given the complete dearth of evidence on this particular issue, a reasonable fact finder could not conclude that the parking lot was within the lawful limits of the premises to be searched.

Likewise, there is no evidence in the record with respect to the second *Bailey* factor, which asks whether the defendant was within the line of sight of the premises to be searched at the time of his warrantless seizure. No testimony or other evidence adduced at the suppres-

sion hearing indicated where or on what floor Rivera's apartment was located at 12-14 South Street, whether the apartment faced the parking lot, the actual distance between the parking lot and the exterior entrance to the building, or whether the defendant could observe Rivera's apartment and/or the exterior entrance to the building from the location where he was seized.[14] As a result, we conclude that the second *Bailey* factor also cannot justify application of the *Summers* exception. See *United States* v. *Moore*, Docket No. 15-116(1)&(2) (DWF/JSM), 2015 WL 8779926, \*6 (D. Minn. December 15, 2015) (police officer "could not recall the location of the car [in which the defendant was detained] with precision," and, therefore, evidence was insufficient to find defendant was in line of sight of premises to be searched), aff'd sub nom. *United States* v. *Claybron*, 716 Fed. Appx. 564 (8th Cir. 2017); *Widi* v. *McNeil*, Docket No. 2:12-cv-00188-JAW, 2015 WL 8334962, \*2 n.1 (D. Me. December 8, 2015) (declining to decide whether defendant's "presence at a gas station 300 yards away from the searched residence would be deemed in the 'immediate vicinity' " but noting that "[t]here [was] no evidence in [the] record for some of the *Bailey* factors, including line of sight"), appeal dismissed sub nom. *Widi* v. *United States Attorneys Office*, Docket Nos. 17-1948 and 17-2001, 2018 WL 11199004 (1st Cir. September 21, 2018); *Cabral* v. *New York*, Docket No. 12 Civ. 4659 (LGS), 2014 WL 4636433, \*4 (S.D.N.Y. September 17, 2014) ("[N]othing in the record suggests—and [the] [d]efendants do not claim—that [the] [p]laintiff was an occupant of the searched apartment at any relevant time, had any intention of entering it or otherwise had any connection to it. Moreover, [the] [p]laintiff was inside a vehicle that was '[a]round the block' from the apartment according to [the detective], not within the line of sight, and access to the apartment presumably would have required passage through at least one if not two doors. These facts are far from satisfying the *Summers* standard, and could not have justified [the] [p]laintiff's initial detention as effected incident to the search of the apartment." (Footnote omitted.)), aff'd, 662 Fed. Appx. 11 (2d Cir. 2016).

The third and final *Bailey* factor—the ease with which the defendant could have reentered the premises to be searched—also suffers from a deficiency of proof. As we previously explained, there is no evidence in the record regarding the spatial proximity between the site at which the defendant was seized and Rivera's apartment or the presence or absence of physical impediments (such as locked exterior doors) that may have affected the defendant's ease of access. Compare *Cabral* v. *New York*, supra, 2014 WL 4636433, \*4 (finding no ease of reentry because "access to the apartment presumably would have required passage through at least one if not two doors"), with *United States* v. *Ruiz*, supra, 2014 WL 10183873, \*8 (third *Bailey* factor sup-

ported finding that defendant was in immediate vicinity of premises because government's testimony and exhibits established that "reentry to [the] [d]efendant's residence from the location of the stop could have been easily achieved given the proximity of the two locations and the absence of physical impediments between them"). Indeed, there is no basis on this record to believe that the defendant had any ability to enter, much less reenter, Rivera's apartment. In the absence of such evidence, this factor, like the other *Bailey* factors, fails to support a conclusion that the defendant was within the immediate vicinity of Rivera's apartment and "pose[d] a real threat to the safe and efficient execution of [the] search warrant . . . ." *Bailey* v. *United States*, supra, 568 U.S. 201.

The lack of pertinent evidence in this case is not surprising: the state did not undertake or intend to prove at the evidentiary hearing on the motions to suppress that the defendant was an "occupant" within the "immediate vicinity" of the premises to be searched under *Summers* and *Bailey*. Instead, the state sought to prove that the warrantless search and seizure of the defendant and his motor vehicle were justified by the *Terry* and plain view doctrines. When the trial court first brought up the *Summers* exception after the close of evidence, the prosecutor unequivocally expressed his view that, with respect "to *Summers* and *Bailey*, I just don't think that they apply to these facts." It was only after the trial court pointed out that "*Bailey* and *Summers* would advantage the state because [they] would allow a detention to take place even in the absence of [a] reasonable and articulable suspicion" under the *Terry* doctrine that the prosecutor said that he would be "a fool not to ask the court to entertain it." Although the state belatedly raised a *Summers* argument in response to the trial court's posthearing observations, it failed to meet its burden of providing the trial court with the factual predicate necessary to establish the applicability of the exception.

The state points out that numerous courts have applied the *Summers* exception under factual circumstances similar to the present case and urges this court to follow out-of-state precedent such as *United States* v. *Jennings*, 544 F.3d 815 (7th Cir. 2008), and *Burchett* v. *Kiefer*, 310 F.3d 937 (6th Cir. 2002). See *United States* v. *Jennings*, supra, 818 (defendant's detention was justified under *Summers* because "he entered the security perimeter surrounding the apartment where the narcotics search was underway"); *Burchett* v. *Kiefer*, supra, 939, 943–44 (holding that defendant's fourth amendment rights were not violated under 42 U.S.C. § 1983, even though he "neither was a resident of the searched premises nor arrived at the searched premises," because police have authority under *Summers* to "detain an individual who approaches a property being searched pursuant to a warrant, pauses at the property

line, and flees when the officers instruct him to get down"). These cases cannot guide our inquiry, however, because they predate *Bailey* and consequently fail to consider whether the defendant was in the immediate vicinity of the premises to be searched using the spatial analysis that *Bailey* requires.[15] In the absence of a spatial analysis under the *Bailey* factors, it is unclear whether the police had "the power to detain persons stopped or apprehended away from the premises where the search is being conducted." *Bailey* v. *United States*, supra, 568 U.S. 195.

Lastly, the state claims that the warrantless seizure of the defendant was justified under the *Summers* exception because the important law enforcement interests in officer safety, orderly completion of the search, and prevention of flight outweighed the brief and limited intrusion on the defendant's liberty. We reject the state's claim because it contravenes the very premise of *Summers* and its progeny, which rejects a reliance on generic principles of reasonableness under an amorphous balancing test in this context. Indeed, the United States Supreme Court has emphasized that the *Summers* exception is categorical in nature and does not require us to evaluate "the quantum of proof justifying [the] detention or the extent of the intrusion . . . imposed by the seizure." (Internal quotation marks omitted.) *Bailey* v. *United States*, supra, 568 U.S. 193; see also *Muehler* v. *Mena*, 544 U.S. 93, 98, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) ("[a]n officer's authority to detain incident to a search is categorical"); *Croom* v. *Balkwill*, 645 F.3d 1240, 1247–48 (11th Cir. 2011) ("[i]mportantly, [although] its decision in *Summers* was driven by a careful balancing of factors and facts, the [c]ourt clarified that [its] rule thus established did not call for a repetition of that balancing in each of its applications"). If an occupant is "present when and where the search is being conducted"; *Bailey* v. *United States*, supra, 197; a warrantless detention, "under *Summers*, [is] plainly permissible." *Muehler* v. *Mena*, supra, 98. "Once an individual has left the immediate vicinity of a premises to be searched, however, detentions must be justified by some other rationale." *Bailey* v. *United States*, supra, 202. We acknowledge that this case, like *Bailey* itself, illustrates that some amount of line drawing is inevitable even in the *Summers* context, as courts demarcate the boundaries within which the bright-line rule operates, but we nonetheless adhere to the United States Supreme Court's expressed preference to eschew case-by-case interest balancing when applying the *Summers* exception. We hold that the *Summers* exception did not justify the defendant's warrantless seizure in the present case because the state failed to meet its burden of establishing that the defendant was within the immediate vicinity of the premises to be searched. We therefore conclude that the defendant's fourth amendment rights were violated and his motion

to suppress should have been granted.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress.

In this opinion the other justices concurred.

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

\*\* November 13, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] "[T]he address of 12-14 South Street is a multiunit apartment building" that "consists of ten to twelve separate residences."

[2] "The images captured by the surveillance camera were preserved and were introduced as evidence at the hearing on the motions to suppress."

[3] "The two cars were positioned in such a way that Rivera and [the defendant] conducted their conversation over and across the roof of [the defendant's] vehicle."

[4] The defendant claimed that the evidence seized from Espino's apartment was the "fruit of the poisonous tree" of the earlier warrantless seizure. See *State* v. *Jevarjian*, 307 Conn. 559, 565 n.5, 58 A.3d 243 (2012) (describing "fruit of the poisonous tree" doctrine as "an extension of the general exclusionary rule that specifically applies to evidence derived indirectly from an unlawful search rather than all evidence unlawfully seized" (internal quotation marks omitted)). In the trial court proceedings, the parties "agreed that the court's ruling on the constitutionality of the warrantless search [and seizure] will also resolve the suppression issues relating to the later search of [Espino's] home." Likewise, on appeal, the parties do not dispute that the constitutionality of the initial warrantless seizure in the parking lot of 12-14 South Street is dispositive of the constitutionality of the later search of Espino's apartment.

[5] "In *Terry*, the United States Supreme Court held that police may detain an individual when the following three conditions are met: '(1) the officer must have a reasonable suspicion that a crime has occurred, is occurring, or is about to occur; (2) the purpose of the stop must be reasonable; and (3) the scope and character of the detention must be reasonable when considered in light of its purpose.' " *State* v. *Kelly*, 313 Conn. 1, 9 n.6, 95 A.3d 1081 (2014).

[6] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

[7] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[8] The defendant has not raised or briefed a separate claim under our state constitution or challenged the trial court's determination that the subsequent search of the defendant's person and motor vehicle was justified by the plain view doctrine. We therefore limit our analysis to the constitutionality of the initial warrantless seizure of the defendant under the *Summers* exception to the fourth amendment's warrant requirement. See, e.g., *State* v. *Boyd*, 323 Conn. 816, 818–19 n.2, 151 A.3d 355 (2016) (limiting analysis to federal constitution in absence of appellate claim that state constitution affords greater rights than federal constitution).

[9] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. The fourth amendment's protection against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d

1081 (1961).

[10] The state has abandoned its claim that the initial warrantless seizure of the defendant was supported by a reasonable, articulable suspicion under the *Terry* doctrine. See, e.g., *Traylor* v. *State*, 332 Conn. 789, 804, 213 A.3d 467 (2019) ("[a party's] failure to brief a challenge to the trial court's conclusions in its memorand[um] of decision abandons any such challenge to those conclusions").

[11] See 2 W. LaFave, Search and Seizure (5th Ed. 2012) § 4.9 (e), pp. 924–26 ("[e]specially because the [c]ourt [in *Summers*] elsewhere refers to the category of persons covered as 'residents' who would ordinarily 'remain in order to observe the search of their possessions,' it would seem that the word 'occupants' is not to be loosely construed as covering anyone present, but instead is to be interpreted literally (though many cases have interpreted *Summers* otherwise)" (footnotes omitted)).

[12] In *Torres*, the defendant, Confessor Torres, entered the apartment that he was visiting, accompanied by the tenant and another individual, approximately one hour after the police had conducted a search of the premises pursuant to a valid warrant. *State* v. *Torres*, supra, 197 Conn. 622–23. Torres was detained at the scene, and cocaine was discovered on his person. Id., 623. The trial court concluded that Torres' warrantless detention was lawful under *Summers*. Id., 625. We affirmed, but on the alternative ground that Torres' detention was justified under *Terry* v. *Ohio*, supra, 392 U.S. 29–30. *State* v. *Torres*, supra, 625. In doing so, we expressed doubt about the applicability of the *Summers* exception, stating that, "[i]n this case, [Torres] was a visitor to [the tenant's] apartment and not an 'occupant' as it appears that term may have been used in *Summers*." Id.

[13] In both *Summers* and *Bailey*, the defendants were residents of the premises to be searched. In the absence of such definitive facts, "the [United States] Supreme Court has not directly resolved the issue of who qualifies as an 'occupant' for the purposes of the *Summers* rule." *State* v. *Wilson*, 371 N.C. 920, 925, 821 S.E.2d 811 (2018). There is a split of authority whether the "occupant and immediate vicinity questions are separate requirements . . . ." *United States* v. *Freeman*, 964 F.3d 774, 781 (8th Cir. 2020). Some courts have defined the term "occupant" broadly to include persons on the premises or in the immediate vicinity of the premises to be searched. See, e.g., *Bailey* v. *United States*, supra, 568 U.S. 203 (Scalia, J., concurring) ("[O]ccupants" means "persons within the immediate vicinity of the premises to be searched. . . . It really is that simple." (Citation omitted; internal quotation marks omitted.)); *United States* v. *Sanchez*, 555 F.3d 910, 918 (10th Cir.) ("occupant" includes "all persons present on the premises" regardless of residency), cert. denied, 556 U.S. 1145, 129 S. Ct. 1657, 173 L. Ed. 2d 1027 (2009); *Burchett* v. *Kiefer*, 310 F.3d 937, 943 (6th Cir. 2002) (noting that "the Supreme Court's discussion of 'occupants' in *Summers* included nonresidents who are present at the scene of a search when [the] police arrive" and those "who arrive at the scene of a search, even if they were not inside the residence or present when [the] police first arrived"). Under such a broad construction, "an occupant is defined by his or her location—i.e., an occupant *is* a '[person] within the immediate vicinity of the premises to be searched.' " (Emphasis in original.) *United States* v. *Freeman*, supra, 780–81, quoting *Bailey* v. *United States*, supra, 586 U.S. 203 (Scalia, J., concurring).

Other courts have construed the term "occupant" narrowly to include only those persons who reside at the premises. See, e.g., *United States* v. *Reid*, 997 F.2d 1576, 1579 (D.C. Cir. 1993) ("unlike Summers, [the defendant] was not a resident of the apartment which was to be searched under the warrant, and the trial did not disclose that he had any proprietary or residential interest in the suspect premises" (emphasis omitted)), cert. denied, 510 U.S. 1132, 114 S. Ct. 1105, 127 L. Ed. 2d 417 (1994); *State* v. *Kaul*, 891 N.W.2d 352, 356 (N.D. 2017) (declining "to expand the meaning of 'occupants' under *Summers* to a person approaching the premises as a visitor"); *Lippert* v. *State*, 664 S.W.2d 712, 720 (Tex. Crim. App. 1984) (holding that *Summers* exception cannot "be extended to a [nonoccupant]" who was not target of warrant and entered premises after commencement of search). Under a narrow construction, the "occupant" and "immediate vicinity" questions are separate and distinct inquiries.

Still other courts view the occupancy requirement as a separate doctrinal limitation on the *Summers* exception, but one that is inextricably intertwined with the immediate vicinity inquiry. Under this hybrid approach, an "occupant" is someone present on the premises or in the immediate vicinity of the premises who also has a demonstrable connection to the premises, a

resident of the premises, or the criminal activity conducted at the premises. See, e.g., *United States* v. *Freeman*, supra, 964 F.3d 781 ("a passenger of a car parked on a street in front of a premises subject to a search warrant who was connected to the [premises'] occupant . . . was also an 'occupant' under *Summers*"); *Stanford* v. *State*, 353 Md. 527, 536, 727 A.2d 938 (1999) (recognizing that some jurisdictions permit visitors to be detained under *Summers* exception "if the police can point to reasonably articulable facts that associate the visitor with the residence or the criminal activity being investigated in the search warrant").

[14] We have reviewed the surveillance video that was introduced into evidence at the suppression hearing. See footnote 2 of this opinion. The video does not depict the exterior entrance to 12-14 South Street, so it is impossible to determine the distance between the exterior entrance and the location where the defendant was seized. Even if the approximate distance to the building entrance could be estimated, there is no basis for determining lines of sight because the record does not reveal the location of Rivera's apartment in relation to either the parking lot generally or the particular location where the defendant was seized.

[15] In its brief, the state cites two cases that were decided after *Bailey*: *State* v. *Wilson*, 371 N.C. 920, 821 S.E.2d 811 (2018), and *State* v. *Davis*, 158 Idaho 857, 353 P.3d 1091 (App. 2015). Both cases are readily distinguishable. In *Wilson*, the nonresident defendant, Terry Jerome Wilson, was detained in the driveway of a house in which the police were executing a search warrant. *State* v. *Wilson*, supra, 921. The Supreme Court of North Carolina held that Wilson's warrantless seizure was justified by the *Summers* exception because Wilson was "within the immediate vicinity of the premises being searched." Id., 924. Applying the *Bailey* factors, the court reasoned that Wilson "was well within the lawful limits of the property containing the house being searched. And, had he not been stopped by police, [he] could easily have accessed the house. Thus the spatial requirements of the *Summers* rule were met here." Id., 924–25. In contrast to *Wilson*, there was no evidence in the present case to establish that the defendant was within the lawful limits or line of sight of the premises to be searched or that he easily could have entered the premises as required by *Summers* and *Bailey*.

*Davis* is distinguishable for similar reasons. The defendant, Russell Glenn Davis, was a nonresident detained "on a communal sidewalk that led to the common entry area of only four apartments." *State* v. *Davis*, supra, 158 Idaho 862. Davis was walking toward the stairs of the only entrance to the second floor apartment being searched, and he was "perhaps [eight] to [ten] feet, at the most, from the bottom of the stairs" when he was detained. Id. The Court of Appeals of Idaho held that Davis was "in the immediate vicinity of the premises being searched" in light of the layout of the property, Davis' presence in a communal area, and his close proximity to the entry of the apartment being searched. Id. Not incidentally, the court cautioned that its holding was limited to the facts presented and that, "[i]n context of the important interests outlined by the [United States] Supreme Court in *Summers*, officers would not be justified in detaining an individual who walks past a [fifty story] apartment building while a search occurs in one of the apartments because the individual usually would not be within the immediate vicinity of the premises being searched." Id.

––––––––––––––––