In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-1115

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BODIE B. WITZLIB,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CR-99 — **Lynn Adelman**, *Judge.*

SUBMITTED JULY 22, 2015 — DECIDED AUGUST 7, 2015

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* This appeal from a conviction for manufacturing and dealing in explosive materials (defined in 18 U.S.C. § 841(c)–(f)) without a license to engage in such activities, in violation of 18 U.S.C. § 842(a)(1), raises several questions concerning the Fourth Amendment's prohibition of unreasonable searches.

The defendant's aunt and uncle reported to the police that the defendant was making M-80s in the basement of his grandmother's house, where he as well as his grandmother lived; the house is next door to the aunt and uncle's house. "M-80" is a common designation of an explosive device used, often without legal authorization, as a firecracker. *Bureau of Alcohol, Tobacco, Firearms and Explosives*, "ATF Fact Sheet—Illegal Explosives Devices" (February 1, 2015), www. atf.gov/resource-center/pr/atf-fact-sheet-illegal-explosives-devices (visited on August 6, 2015, as were the other websites cited in this opinion). A federal license is required for its manufacture. 18 U.S.C. § 842(a)(1); *Wikipedia*, "M-80 (explosive)," https://en.wikipedia.org/wiki/M-80_(explosive). (Wisconsin, where the crime occurred, prohibits even simple possession of such "improvised explosive devices." Wis. Stat. § 941.31(2)(a)–(b).) Illegal manufacture of M-80s is at once common and highly dangerous because of the explosive potential of the pyrotechnic flash powder that is their principal ingredient. Eleven people were killed in the explosion of an illegal M-80 factory in Benton, Tennessee, in 1983. *Wikipedia*, "Benton Fireworks Disaster," https://en.wikipedia. org/wiki/Benton_fireworks_disaster. *United States v. Womack*, 654 F.2d 1034, 1039–40 (5th Cir. 1981), notes that M-80s are "50 to 75 times more explosive than legally salable firecrackers," which brings them within the federal definition of "explosives."

The defendant was manufacturing M-80s in his grandmother's basement, though on a much smaller scale than the Benton factory. His aunt told the police that her nephew held "anti-government beliefs," was unpredictable, and didn't take the medications prescribed for his "mental health

issues." The uncle added that he'd seen Witzlib making and storing M-80s in the grandmother's house.

After consulting with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives, local police officers accompanied by a Bureau agent went to the grandmother's house and knocked on the door. Witzlib answered the knock and the officers asked him to accompany them to the driveway of the house, where they told him that they were "responding to a fireworks complaint" and needed to conduct a "safety check" of the house. He demanded to see a search warrant, which they didn't have, and told them he would not consent to a search. They ignored his expostulations, and while he waited in the driveway of the house with one of the officers the others returned to the house and asked the grandmother whether she'd let them search it for fireworks. She said yes, signed a consent-to-search form, and told the officers that her grandson had been making fireworks in the basement. They went there and found about a thousand M-80s. They arrested Witzlib but for the time being left the M-80s where they were.

The search had been conducted in the evening; early the next morning officers removed the M-80s from the basement. In the afternoon they obtained for the first time a warrant to search the house. A further search (the third and last), pursuant to the warrant, ensued and uncovered additional incriminating items.

In urging reversal of his conviction on the ground that the first search was illegal and the evidence found in it therefore inadmissible, Witzlib makes much of the fact that the officers had plenty of time, after talking to his uncle and aunt, to obtain a warrant—indeed, four hours elapsed be-

tween their talking to them and their arriving at the grand-mother's house to conduct the first search. But consent is an alternative to a search warrant, provided it's consent by someone who has, or appears to have, the right to consent. See, e.g., *United States v. Richards*, 741 F.3d 843, 850–51 (7th Cir. 2014).

The grandmother owned the house but Witzlib also resided there and he argues that therefore his consent was required. We don't think so. It would be one thing had the police wanted to search his bedroom. To say that the owner of the house could consent to such a search would be as unreasonable as saying that a hotel's owner or manager could consent to a police search of all the guest rooms. See *Georgia v. Randolph*, 547 U.S. 103, 112 (2006); *Minnesota v. Carter*, 525 U.S. 83, 88–90 (1998); cf. *Minnesota v. Olson*, 495 U.S. 91 (1990). Or that the person refusing consent had a lesser right to decide whether to permit the search than the person granting consent did, for example if they were a married couple and the search would be of their joint household, as in *Georgia v. Randolph*.

But the police wanted only to search the basement, which was no more Witzlib's private space than the living room was. He could not reasonably believe that merely because some of his possessions (the M-80s) were in the basement, his grandmother—the owner of the home—could not authorize a search of it. In other words, this is a "joint access" case, in which "shared premises" or (equivalently) "common authority over the premises" permit one of the joint occupants of the premises to consent to a search without obtaining the permission of the other or others. See *id.*, 547 U.S. at 110–11; *Fernandez v. California*, 134 S. Ct. 1126, 1133 (2014);

*Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990); *United States v. Matlock*, 415 U.S. 164, 170 (1974). *Georgia v. Randolph* suggests that "a potential defendant with self-interest in objecting" (regardless of his exact status in the household) who is "in fact at the door and object[ing]" can bar a consent search authorized by a joint occupant, but not a potential defendant who is "nearby but not invited to take part in the threshold colloquy." 547 U.S. at 121; see also *Fernandez v. California*, *supra*, 134 S. Ct. at 1134–36; *United States v. Henderson*, 536 F.3d 776, 784 (7th Cir. 2008). Witzlib, standing in the driveway, was in the second category.

The government argues in the alternative (unnecessarily, and also unpersuasively) that the danger posed by the M-80s justified an immediate search—that it would have been risky to lose time seeking a search warrant. That is an appeal to the "exigent circumstances" exception to the requirement of obtaining a warrant to search a home, an exception frequently invoked in cases involving explosives. See, e.g., *United States v. Infante*, 701 F.3d 386, 393–94 (1st Cir. 2012); *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1071–73 (10th Cir. 2010); *United States v. Lindsey*, 877 F.2d 777, 781–82 (9th Cir. 1989); *United States v. Al-Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985). But in this case it is refuted by the four-hour delay in conducting the search after the police had obtained ample probable cause from their conversation with the aunt and uncle. Indeed there was a delay of more than 24 hours between when the police first learned from Witzlib's aunt and uncle of the M-80s in the basement and when they conducted the search pursuant to the belatedly obtained warrant. None of the cases we've cited involved a delay of more than an hour, and there is no suggestion that the police could not have obtained a warrant in an hour or less.

Where exigency is pertinent to this case is in relation to what the uncle told the police when they first spoke to him and the aunt—that Witzlib had made M-80s and was storing them in the basement of his grandmother's house. These are dangerous explosives, especially when homemade—and by a person with "mental health issues" to boot. The police may well have been lax in taking so long to conduct a thorough search after hearing from the uncle, but we don't see why that laxity should benefit Witzlib.

There is an alternative justification, besides consent and exigency, for the initial search (which happens also to have been the search that turned up by far the most important evidence of Witzlib's guilt). Had the police sought a search warrant from the moment they finished talking to the uncle and aunt, it's a certainty that it would have been issued—such was the probable cause created by what they told the police. See *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008). So whether they got a warrant or not there was no way that Witzlib's fireworks stash was going to remain undiscovered by the authorities.

We're mindful that lawful presence alone does not trigger application of the inevitable-discovery doctrine of the *Nix* case. In *Michigan v. Clifford*, 464 U.S. 287 (1984), and *Michigan v. Tyler*, 436 U.S. 499 (1978), firemen lawfully entered buildings to fight fires, but were held not to be entitled to return later for the purpose of seeking evidence of arson by the owners, without a warrant. If the M-80s in the basement of the grandmother's house had gone off, and the fire department had been called, and later the police had searched the house without having either consent or a search

warrant, we would have a parallel case. But the first and second searches in this case were pursuant to consent, and the third to a valid warrant.

AFFIRMED