# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 19-2055

———————————————

United States of America

*Plaintiff - Appellee*

v.

Maurice Freeman

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Western District of Missouri - Kansas City

——————————

Submitted: February 13, 2020
Filed: July 10, 2020

——————————

Before SMITH, Chief Judge, COLLOTON and STRAS, Circuit Judges.

——————————

SMITH, Chief Judge.

Maurice Freeman appeals his conviction on an illegal weapons charge. Freeman argues that the police violated his Fourth Amendment rights by detaining him while executing a warrant on a residence he was parked near. Given the circumstances of the detention, we disagree and affirm the district court.[1]

———————————————

[1]The Honorable Brian C. Wimes, United States District Judge for the Western District of Missouri.

## I. *Background*

Police searched for the two perpetrators of a bank robbery and shooting. They identified one suspect as Derrick Ashley, Jr., but the identity of the other remained unknown. Investigation led law enforcement to a house in St. Joseph, Missouri. To acquire information for a warrant application, a detective watched the St. Joseph house to see if Ashley was inside. As he drove past the residence, the detective observed a tan car parked directly in front of the residence and a silver Pontiac with two occupants parked behind the tan car. The detective parked a short distance away.

Eventually, the detective saw Ashley walk out of the house and speak with the Pontiac's passengers. The Pontiac drove away soon thereafter but returned less than an hour later. It parked behind a Cadillac, which had parked behind the tan car while the Pontiac was away. Ashley again exited the residence and walked to the Pontiac. He took a bag of dog food from the car and returned inside. Law enforcement used the information the surveilling detective gathered to obtain a search warrant for the house Ashley occupied.

Special response team officers then arrived in an armored car and parked in front of the house. The surveilling detective and multiple officers walked up the street to help secure the cars' occupants. As they approached the Pontiac, which had an open sunroof, the officers smelled marijuana.[2] One officer looked into the Pontiac and saw the driver lean forward. The driver was later identified as Maurice Freeman. Believing Freeman was attempting to conceal something in or retrieve something from the floorboard, the officer ordered the car's occupants to turn the engine off and raise their hands.

_____

[2]The smell of marijuana was so pungent that an officer who smelled the Pontiac at the impound garage called one of the investigating officers and asked if a large amount of marijuana had been seized from the car.

Freeman and the other passenger were removed from the car, handcuffed, and taken to the armored vehicle. Based on the smell of marijuana, officers searched the car. That search revealed a handgun and a pill bottle that appeared to contain marijuana; Freeman admitted the gun was his. Freeman was arrested, and police later found methamphetamine on his person.

A grand jury indicted Freeman with felony possession of a firearm. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2). Freeman moved to suppress all of the evidence discovered in the Pontiac. He argued that the warrant did not cover his car and that the police lacked reasonable suspicion to stop him.

A magistrate judge recommended that the district court deny the motion. The magistrate judge found a sufficient nexus between the car's occupants and Ashley—a dangerous suspect—to justify the officers' decision to secure the car's occupants and ensure officer safety during the warrant's execution. The magistrate judge found the officers developed probable cause to search the car and arrest its passengers based on the emanation of the strong smell of marijuana. The district court adopted the magistrate's findings and denied Freeman's motion. Freeman conditionally pleaded guilty and was sentenced to 37 months' imprisonment.

## II. *Discussion*

On appeal, Freeman challenges the district court's denial of his suppression motion. We review the court's "legal conclusions de novo and factual findings for clear error." *United States v. Morris*, 915 F.3d 552, 555 (8th Cir. 2019) (internal quotation omitted).

The Supreme Court has recognized "that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (footnotes omitted). When determining whether a detention

is permissible, the Court has considered "[1] the character of the official intrusion and [2] its justification." *Id.* at 701. When weighing the character of the intrusion, the Court has examined the intrusiveness of the detention and the stigma the detention carried. *See id.* at 701–02; *see also Bailey v. United States*, 568 U.S. 186, 200 (2013). The Court has identified three justifications that support a detention: "officer safety, facilitating the completion of the search, and preventing flight." *Bailey*, 568 U.S. at 194; *see also Summers*, 452 U.S. at 702–04.

Applying the Supreme Court's analysis in *Summers* and *Bailey*, we conclude Freeman's brief detention[3] was permissible. In *Summers*, police had a search warrant for the defendant's home and detained the defendant, who was stopped walking down the steps of the house during the warrant's execution. 452 U.S. at 693–94. The Court upheld that detention. *Id.* at 705. Considering the character of the intrusion, the Court found that the detention "was surely less intrusive than the search [of the home] itself." *Id.* at 701. In addition, the occupant's detention was not likely to be exploited to gain incriminating information because the police already had a valid warrant to accomplish that goal. *Id.* Further, the detention did not significantly add to the public stigma caused by the search itself. *Id.* at 702.

The Court also found that the police had valid justifications for the detention. First and "[m]ost obvious [wa]s the legitimate law enforcement interest in preventing flight in the event that incriminating evidence [wa]s found." *Id.* Second and "sometimes of greater importance, [wa]s the interest in minimizing the risk of harm to

---

[3]Freeman was eventually removed from his car, handcuffed, and placed in the armored vehicle. However, those facts are not relevant to our inquiry because they arose once the police smelled the marijuana and saw Freeman's furtive hand movements. In other words, those facts arose after the police had independent probable cause. *See United States v. Beard*, 708 F.3d 1062, 1065 (8th Cir. 2013). Because of that, they are not relevant in weighing the allegedly improper aspects of Freeman's detention: the officers' decision to block the Pontiac in and approach the vehicle.

the officers." *Id.* And third, the Court found that officers have an interest in "the orderly completion of the search," which "may be facilitated if the occupants of the premises are present." *Id.* at 703.

In *Bailey*, the Court addressed "whether *Michigan v. Summers* justifies the detention of occupants beyond the immediate vicinity of the premises covered by a search warrant." 568 U.S. at 192. There, officers watched two individuals drive away from an apartment that was the subject of a search warrant. *Id.* at 190. While some officers began the search, others followed and stopped the occupants about a mile from the apartment. *Id.* They then handcuffed the occupants and brought them back to the home. *Id.* at 191.

The Court observed that its cases so far had only considered "occupants detained . . . within or immediately outside a residence at the moment the police officers executed the search warrant." *Id.* at 193. In determining *Summers*'s scope, the Court noted that "[a]n exception to the Fourth Amendment rule prohibiting detention absent probable cause must not diverge from its purpose and rationale." *Id.* at 194. Therefore, it considered "the reasons for the rule explained in *Summers* to determine if its rationale extend[ed] to a detention like the one" before it. *Id.*

The Court analyzed the three justifications for a detention recognized in *Summers*, and it stated that the occupants "posed little risk to the officers at the scene," *id.* at 196, because they "left the premises . . . without knowledge of the search." *Id.* at 195–96. Further, the officers could have mitigated any risk posed by their return "by taking routine precautions, for instance by erecting barricades or posting someone on the perimeter." *Id.* at 195. As for the orderly execution of the warrant, the Court concluded that a departed occupant does not pose a risk of "hid[ing] or destroy[ing] evidence, seek[ing] to distract the officers, or simply get[ting] in the way." *Id.* at 197. Lastly, the Court considered the officers' interest in preventing flight, which "serves to preserve the integrity of the search by controlling those persons who are on the

scene." *Id.* at 198. It reasoned that "[t]he concern over flight is not because of the danger of flight itself but because of the damage that potential flight can cause to the integrity of the search." *Id.* at 199. That "does not independently justify detention of an occupant beyond the immediate vicinity of the premises to be searched." *Id.*

As for the character of the intrusion, the Court decided that a detention away from one's home is a significant intrusion on personal liberty because of the stigma it carries. *Id.* at 199–200. "A public detention, even if merely incident to a search, will resemble a full-fledged arrest." *Id.* at 200. Further, "detention beyond the immediate vicinity can involve an initial detention away from the scene and a second detention at the residence. In between, the individual will suffer the additional indignity of a compelled transfer back to the premises, giving all the appearances of an arrest." *Id.*

In light of those factors, the Court placed "[a] spatial constraint" on *Summers*, limiting it to "the immediate vicinity of the premises to be searched." *Id.* at 201. Because the petitioner was almost a mile from his home at the time of his detention, the Court determined that *Summers* did not apply. *Id.* at 201–02; *see also United States v. Sherrill*, 27 F.3d 344, 346 (8th Cir. 1994) (finding that *Summers* did not justify a stop made down the street from a house because "the officers had no interest in preventing flight or minimizing the search's risk because [the defendant] had left the area of the search and was unaware of the warrant").

Freeman argues that the justifications articulated in *Summers* and *Bailey* do not support the detention here. We disagree. As to officer safety, the Court in *Summers* recognized that "[a]lthough no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Summers*, 452 U.S. at 702. The same could be said of the search warrant here. The officers were seeking Ashley, the suspect of a gun shooting and bank robbery. The execution of a warrant for such an individual qualifies as one that "may

-6-

give rise to sudden violence or frantic efforts to conceal . . . evidence" or escape. *Id.* Further, Ashley's accomplice was still at large, and the police observed Ashley twice interacting with the Pontiac's passengers. Officers testified that the Pontiac and its passengers were either three car lengths from the home or between the house and residence to the north. That placed the passengers "within the line of sight of [the] dwelling." *Bailey*, 568 U.S. at 201. If armed, those passengers "pose[d] a real threat to the safe and efficient execution of [the] search warrant." *Id.* Given that threat; the Pontiac's passengers' "connection to the residence to be searched," *id.* at 197; and the dangerous suspect therein, a concern for officer safety justified the brief detention which occurred here.

Next, the Court has observed that officers' interest in "the orderly completion of the search . . . . derives from distinct . . . concerns." *Id.* (internal quotation omitted). "If occupants are permitted to wander around the premises, there is the potential for interference with the execution of the search warrant. They can hide or destroy evidence, seek to distract the officers, or simply get in the way." *Id.* Though not within the house, the same can be said of the Pontiac's passengers here. They were present at the scene and could have exited their vehicle to interfere with the search for and arrest of Ashley. Therefore, the interest in an orderly execution of the search warrant also provided some justification for the detention of the vehicle's occupants.

As for the interest in preventing flight, the officers' main focus was certainly preventing Ashley's escape from the premises, not the passengers in the car. Still, the Court has provided that the interest in preventing flight, much like the orderly completion of the search interest, "serves to preserve the integrity of the search by controlling those persons who are on the scene." *Id.* at 198. On these facts, this factor does not favor the detention. But it, by itself, does not outweigh the first two interests here.

Freeman argues that, even if there were valid justifications for the search, the character of the detention takes it outside of the scope of *Summers*. *See* 452 U.S. at 703–04. Admittedly, unlike the occupant in *Summers*, Freeman had neither the protections that a search warrant provides nor did he face the liberty infringement one creates. *See id.*; *see also Bailey*, 568 U.S. at 200 ("Because the detention occurs in the individual's own home, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." (internal quotation omitted)). Still, the Court's *Bailey* analysis does not turn on the presence of a warrant. Rather, in analyzing the intrusion on liberty, the Court has focused on the facts surrounding the detention and the "stigma associated with the search." *See Bailey*, 568 U.S. at 200 (internal quotation omitted); *Summers*, 452 U.S. at 703–05.

Considering the instant facts, the intrusion on Freeman's liberty and the associated stigma are dissimilar to those that rendered detentions invalid. In those cases, individuals were driving away from the home and were already well beyond its premises before police officers stopped them and brought them back to the house. *See Bailey*, 568 U.S. at 200; *Sherrill*, 27 F.3d at 345–46. Freeman, in contrast, was sitting in his car parked near the premises to be searched when the stop occurred; he continued sitting in the car after he was blocked in. In other words, the initial detention that Freeman challenges did not alter his course of conduct. True, he no longer had a choice to immediately leave the scene, which is certainly an impingement of his liberty. But these facts differ materially from chasing an individual down, handcuffing him publicly, placing him in a marked patrol car, and carrying him almost a mile to the home being searched. *See Bailey*, 568 U.S. at 190–91.

For similar reasons, Freeman did not suffer a significant public stigma. The officers tasked with securing the occupants of the car walked up the street. Prior to detecting the marijuana smell emanating from the car and seeing Freeman's furtive movements, officers had their guns low and ready—not trained on the car or its

occupants. Given this context, an onlooker would not necessarily think that the Pontiac's occupants were the targets of the police activity. Again, that is not equivalent to the stigma associated with stopping an individual in public, handcuffing him, and driving him back to his home. *Bailey*, 568 U.S. at 200; *Sherrill*, 27 F.3d at 345–46. Considering the Court's justifications in *Summers* and *Bailey*, we hold the officers' brief detention of the occupants of Freeman's vehicle—who had recent contact with the suspected felon and remained parked within the immediate vicinity of the premises to be searched—was permissible.

Freeman argues that *Summers* is a categorical rule "appl[ying] only to seizures of occupants—that is, persons within the immediate vicinity of the premises to be searched." *Bailey*, 568 U.S. at 203 (Scalia, J., concurring) (internal quotations omitted). He argues that he was neither an occupant of the home *nor* was he within the immediate vicinity of the home's premises.

First, we note that even if Justice Scalia's categorical rule bound us,[4] Freeman's arguments misconstrue it. Freeman appears to argue that the rule requires an individual to both be (1) an occupant of the home *and* (2) within the home's immediate vicinity. Yet, per Justice Scalia's language, an occupant is defined by his or her location—i.e., an occupant *is* a "person[] within the immediate vicinity of the premises to be

[4]Though it may be persuasive, we are not bound by a Supreme Court concurrence when it accompanies a majority opinion. *See United States v. Duvall*, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Justices who join the majority may of course express additional thoughts in a concurrence, but concurrences do not bind lower courts in cases where there is a majority opinion."); *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013) ("The reasoning of a Supreme Court opinion that does not command a majority vote is not binding precedent."); *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 878 (4th Cir. 1999) (en banc) ("Justice Brennan's . . . views in dissent, of course, are not binding authority, any more than are Justice Clark's . . . in concurrence."), *aff'd sub nom. United States v. Morrison*, 529 U.S. 598 (2000).

searched." *See Bailey*, 568 U.S. at 203 (Scalia, J., concurring) (internal quotation omitted).

The *Bailey* majority provided several factors to determine whether a person is within the immediate vicinity of the premises to be searched:

> In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors.

*Id.* at 201. It also expressed that "[l]imiting the rule in *Summers to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant* ensures that the scope of the detention incident to a search is confined to its underlying justification." *Id.* (emphasis added).

Freeman was within the line of sight of the dwelling and potentially posed a real threat to the safe and efficient execution of the search. The Pontiac was either three car lengths from the home or between Ashley's house and the house immediately adjacent to the north, and the officers observed Ashley, a potentially dangerous suspect, interact with its occupants. Further, even though it was not within the lawful limits of the premises, the car placed Freeman close enough to allow easy access to the home. Given these facts, we hold that Freeman was in the immediate vicinity of the home. Therefore, Freeman was an occupant even under his proffered categorical rule.

Second, even if the occupant and immediate vicinity questions are separate requirements, Freeman constituted an occupant under persuasive case law. For instance, the Sixth Circuit has found that individuals similarly situated to Freeman constitute occupants. *See Burchett v. Kiefer*, 310 F.3d 937, 943 (6th Cir. 2002) ("We

have extended police officers' powers under *Summers* in two important respects. First, . . . this court ruled that the Supreme Court's discussion of 'occupants' in *Summers* included nonresidents who are present at the scene of a search when police arrive. . . . Second, . . . we ruled that officers could also detain individuals who arrive at the scene of a search, even if they were not inside the residence or present when police first arrived."). In addition, applying the *Summers* rationale to a *Terry* stop, we have allowed officers to stop a vehicle on the street in front of a home that was the subject of a search warrant. *See United States v. Martinez-Cortes*, 566 F.3d 767, 770–71 (8th Cir. 2009); *see also United States v. Jennings*, 544 F.3d 815, 818–19 (7th Cir. 2008) (finding that *Summers* supported the stop of an individual who "never stepped onto the property being searched" because his presence within the security perimeter posed a threat to officers executing a high-risk search warrant). Applying these cases, Freeman—a passenger of a car parked on a street in front of a premises subject to a search warrant who was connected to the premises's occupant—was also an "occupant" under *Summers*.

In sum, we find that Freeman's initial detention was permissible under the Supreme Court's rationale in *Summers*. Thus, the officers' (1) brief detention of the Pontiac's passengers and (2) approach of the car were constitutionally permissible.[5] During that approach, the officers developed probable cause to search the car when they smelled marijuana and saw Freeman's furtive movements. *See Beard*, 708 F.3d at 1065. As a result, their brief seizure of Freeman and subsequent search of the vehicle based on probable cause was constitutional. The district court did not err in denying Freeman's motion to suppress.

---

[5]The parties disagree about when the initial detention occurred. Freeman argues that it occurred when the armored vehicle blocked him in, and the government argues that it occurred when the officers told Freeman to shut off the car and put his hands up. Assuming without deciding that the officers detained Freeman when they blocked his car in, we find that the detention was lawful for the reasons discussed above.

III. *Conclusion*

For those reasons, we affirm.

STRAS, Circuit Judge, concurring in the judgment.

This case is factually indistinguishable from *United States v. Jones*, 471 F.3d 868 (8th Cir. 2006). *Compare id.* at 870–71, 875, *with ante* at 2–3. *See United States v. Martinez-Cortes*, 566 F.3d 767, 770–71 (8th Cir. 2009). Rather than trying to reinvent the wheel, I would simply rely on *Jones* and say nothing more.[6] *See Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).

_____

---

[6]The court's unwillingness to rely on *Jones* is all the more problematic in light of its confusing discussion of the *Michigan v. Summers* line of cases. *Compare Bailey v. United States*, 568 U.S. 186, 193 (2013) (explaining that the "*categorical*" rule from *Summers* "does not depend on the . . . extent of the intrusion" (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)) (emphasis added)); *Lykken v. Brady*, 622 F.3d 925, 932 (8th Cir. 2010) (agreeing that the *Summers* rule *is* "categorical"); *United States v. Jennings*, 544 F.3d 815, 818 (7th Cir. 2008) (same), *with ante* at 9 & n.4 (suggesting that we are "not bound" to apply *Summers* as a "categorical rule").