**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50186 |
| *Plaintiff-Appellee*, | D.C. No. 8:21-cr-00175-FLA-1 |
| v. | |
| BRETT WAYNE PARKINS, | |
| *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Fernando L. Aenlle-Rocha, District Judge, Presiding

Argued and Submitted December 11, 2023
Pasadena, California

Filed February 14, 2024

Before: Susan P. Graber, Morgan Christen, and John B.
Owens, Circuit Judges.

Opinion by Judge Owens

# SUMMARY[*]

## Criminal Law

The panel reversed the district court's denial of Brett Wayne Parkins's suppression motion concerning the search of his apartment, affirmed the district court's refusal to suppress Parkins's pre-arrest and post-arrest statements, and remanded, in a case in which Parkins was convicted of aiming a laser pointer at an aircraft.

The district court held that patrol officers' warrantless search of the apartment, to which Parkins's girlfriend consented, was valid. After reviewing the Supreme Court's cases regarding warrantless searches involving the consent of a co-tenant, the panel concluded that to satisfy *Georgia v. Randolph*, 547 U.S. 103 (2006), Parkins must have both been present on the premises and expressly refused consent. The panel explained that a defendant need not stand at the doorway to count as being physically present— presence on the premises (including its immediate vicinity) is sufficient. The panel wrote that in light of the layout of the property and Parkins's close proximity to his apartment, the nearby mailboxes bordering the parking lot where Parkins was detained were part of the relevant premises; thus, under *Randolph*, Parkins was physically present on the premises to validly object. The panel also wrote that it is clear that Parkins expressly refused consent, as Parkins's statement not to let the police into the apartment expressly conveyed his objection and the import of that statement was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

especially clear following on the heels of his physical resistance at the doorway of his home. Accordingly, the consent-based search of Parkins's home was unlawful.

Because Parkins was not subject to interrogation, the panel affirmed the district court's denial of Parkins's motion to suppress his pre-arrest un-*Mirandized* statements made while he was detained outside his apartment complex.

The panel held that the district court properly declined to suppress, as fruit of the poisonous tree, Parkins's post-arrest statements made during his jailhouse interview. The panel concluded that Parkins's statements at the police station were not a product of the unlawful search of his apartment because the officers did not confront Parkins with the evidence obtained as a result of that search. The panel also concluded that his statements were not a product of a purportedly unlawful arrest, as the police had ample probable cause to arrest Perkins before they found the laser pointer in his apartment.

## COUNSEL

Caroline S. Platt (argued), Assistant Federal Public Defender; Sonam A.H. Henderson, Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Defendant-Appellant.

Kristin N. Spencer (argued) and Melissa S. Rabbani, Assistant United States Attorneys, Office of the United States Attorney, Santa Ana Branch, Santa Ana, California; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief; E. Martin Estrada, United States

Attorney; Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

OWENS, Circuit Judge:

Brett Wayne Parkins was convicted of aiming a laser pointer at an aircraft, in violation of 18 U.S.C. § 39A. On appeal, he argues that the search of his apartment for the laser pointer violated his Fourth Amendment rights and that his statements made outside his apartment during his detention and in jail following his arrest should be suppressed. While we reject the challenges to his statements, we agree that the search of the apartment was problematic. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Laser Strikes

On the night of June 25, 2021, a Huntington Beach Police Department helicopter was searching for a vehicle involved in a fatal hit-and-run. Suddenly, a bright green laser, shot from the ground, struck the aircraft. Laser beams pose a serious safety risk, interfering with a pilot's eyesight and ability to fly safely. This was not a first-time event— over the past six months, lasers repeatedly had hit other police helicopters, and commercial aircraft at nearby airports had complained of similar attacks. The helicopter's crew (Officers Garwood and Vella) turned their attention (and their highly sophisticated thermal camera) to a nearby apartment complex. Officer Garwood had, on previous

flights, been struck by green lasers originating from this same area.

Another laser hit the helicopter. The thermal camera captured the image of a man with a stocky build and large stomach, wearing shorts and a hat, walking from the area of the laser blast into a nearby breezeway, and then disappearing from view. Yet another laser strike, this time from one of the apartment's walkways, targeted the helicopter. The same man reappeared with what seemed to be a water bottle in his hand, walked toward a parked car, opened and shut the car doors, returned to the breezeway, and again disappeared. Moments later, he reappeared in a different area of the apartment complex, ran up some stairs, and was out of sight once again. A few minutes later, the suspect emerged onto a second-floor apartment balcony with the same water bottle, but wearing different clothes. Officer Garwood, believing this man to be responsible for the laser strikes, directed patrol officers to the apartment to investigate further.

## B. The Apartment Encounter

Patrol officers Smith and Rivas arrived at the apartment complex and spotted the suspect (who turned out to be Parkins) standing on the second-floor apartment balcony, as Officer Garwood had described. The officers climbed the stairs and knocked on the door of the apartment, and a woman (Parkins's girlfriend) opened it. She initially denied that her boyfriend (Parkins) was home. But when the officers said that they had just seen him and that they needed to speak with him about shining a laser at the police helicopter, she turned around and walked back into the apartment. The door closed—but did not latch—behind her. The officers pushed the door back open but remained

outside on the landing. While waiting for Parkins, the officers noticed a sign by the front door indicating that the apartment's occupants owned firearms. A few moments later, Parkins's girlfriend returned and told the officers that Parkins was getting dressed.

Parkins soon appeared and stepped outside the apartment onto the landing. The officers asked him if he had any weapons, and he said no. But when the officers began to check him for weapons, Parkins resisted, tried to reenter the apartment, and asked if he was under arrest. Officer Smith grabbed Parkins and pulled him away from the door. Officer Smith confirmed that Parkins lacked any weapons and then escorted him downstairs to a nearby bench for "a chat." A third officer (Officer Jamison) arrived on the scene.

When the officers and Parkins spoke at the bench, Parkins repeatedly denied owning a laser or pointing one at the helicopter. He asked if he could see his girlfriend or return to the apartment, but the officers told him that he was detained. When Parkins asked the same question roughly ten minutes later, the officers again told him that he was detained. At Parkins's request, the officers moved him to a set of mailboxes bordering the parking lot roughly twenty feet from his apartment so he would be less exposed to his neighbors. From this position, Parkins was located down one flight of stairs and one short walkway from the entrance to his unit.

While Officers Rivas and Jamison remained with Parkins, Officer Smith returned to the apartment and asked Parkins's girlfriend if the police could search for the laser pointer. She agreed, and Officer Smith left the apartment to obtain a written consent-to-search form from his car. Officer Smith returned and, as Parkins's girlfriend was executing the

consent form, Parkins yelled to her, "Don't let the cops in, and don't talk to them." Both Officer Smith and Parkins's girlfriend heard Parkins loud and clear—the body camera shows both turning their heads toward Parkins's voice. About a minute later, Parkins yelled, "Don't talk to them, talk to them outside." He then followed up with, "Don't tell them anything." Officer Smith returned downstairs and ordered Parkins removed from the mailbox area in handcuffs and placed in a squad car because he was "running [his] mouth" and "obstruct[ing]" the investigation. Up to this point, Parkins had been detained outside for roughly twenty minutes.

With Parkins secured in the squad car, where he would sit for another half hour, officers searched the nearby area, including his girlfriend's vehicle. (Officer Smith had determined that this vehicle was the same one that Officer Garwood had observed Parkins open.) During the search, Officer Rivas encountered two men who resided in the same complex. One of them referred to Parkins as "the laser pointer guy." The officers then proceeded to search the apartment. After about twenty minutes, they found a laser pointer with the name "Brett" etched on it.

According to their report, the police now believed that they had probable cause to arrest Parkins based on Officer Garwood's observations and the discovery of the laser pointer. The officers thus arrested Parkins and drove him to the Huntington Beach Police Department jail. At no time did Parkins consent to the officers' entry into the apartment, and the officers never obtained a search warrant.[1]

---

[1] Parkins does not dispute that his girlfriend had authority to consent to a search of their shared apartment or that her consent was voluntary.

### C. The Interrogation

At the jail, the helicopter crew (Officers Garwood and Vella) obtained an oral *Miranda* waiver from Parkins and questioned him. The interrogation was recorded on Officer Garwood's body-worn camera. After initially denying that he owned a laser pointer, Parkins eventually admitted to having a green one but claimed that he never aimed it at any aircraft. During the interrogation, the officers never displayed the laser pointer or mentioned having found it in Parkins's apartment.

### D. The Indictment, Suppression Motions, and Conditional Plea

A grand jury indicted Parkins with one count of aiming a laser pointer at an aircraft, in violation of 18 U.S.C. § 39A. Parkins moved to suppress the laser pointer and the post-arrest jailhouse statements as fruits of the warrantless search and/or seizure. He filed a second motion to suppress the statements made during his detention outside the apartment. Neither party requested a hearing.

The challenged search of the apartment required the district court to harmonize a series of Supreme Court cases, including *Georgia v. Randolph*, 547 U.S. 103 (2006), and *Fernandez v. California*, 571 U.S. 292 (2014), regarding warrantless searches involving the consent of a co-tenant. Believing that those cases did not squarely answer the question in this case—whether a defendant must be standing at the doorway to object to a warrantless search to which his co-tenant consents—the district court looked to out-of-circuit precedent, *United States v. Jones*, 861 F.3d 638 (7th Cir. 2017), and concluded that a defendant can validly object to a search of his residence only if he is "standing at the door and expressly refusing consent." *Id.* at

643. Because the officers lawfully removed Parkins from the doorway and escorted him downstairs, the district court concluded that he was not "physically present" to object successfully to the search. And, the district court held, Parkins did not "expressly" refuse consent to search the apartment, as he merely instructed his girlfriend not to admit the officers. The district court reasoned that Parkins never told the officers "directly" that he did not want them in the apartment and Parkins's pleas that the officers not enter the apartment were "[a]t best . . . an implicit refusal" to consent to the search. As Parkins failed to satisfy both requirements of the co-tenant consent search doctrine—presence at the doorway and an express refusal of consent—the district court held that the officers' warrantless search was valid. And, because the district court upheld the warrantless search, the subsequent jailhouse statements could not have been fruit of the poisonous tree.

The district court also denied Parkins's second suppression motion, ruling that Parkins's statements during his detention outside his apartment were not the product of custodial interrogation and thus not protected by *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The district court explained that, although Parkins was not free to leave, his interrogation did not go beyond a brief and relatively non-threatening *Terry* stop. In so holding, the court pointed to the following circumstances: Parkins was consistently told that he was not under arrest; he was afforded some freedom of movement; a twenty-minute detention was reasonable; the police acted diligently in pursuing their investigation; and he was asked a moderate number of questions. The district court also deemed his statements to have been voluntary.

After the denial of his suppression motions, Parkins entered a conditional guilty plea, which permitted him to

challenge these rulings on appeal. The district court sentenced him to eight months in prison and three years of supervised release.

## II. DISCUSSION

### A. Standards of Review

We review de novo a district court's denial of a motion to suppress. *United States v. Zapien*, 861 F.3d 971, 974 (9th Cir. 2017) (per curiam). We review the underlying factual findings for clear error. *Id.* We may affirm the denial of a motion to suppress "on any basis supported in the record." *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005).

We review de novo whether a defendant is "in custody," *United States v. IMM*, 747 F.3d 754, 766 (9th Cir. 2014), or subject to "interrogation" pursuant to *Miranda*, *Zapien*, 861 F.3d at 974.

### B. Warrantless Consent Searches Involving Co-Tenants

Though the Fourth Amendment generally prohibits warrantless entry into a person's home, an exception applies to consent-based searches. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). The government bears the burden to demonstrate that an exception to the warrant requirement applies. *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016).

The Supreme Court has addressed a string of consent search cases involving co-tenants. Before assessing the consent search at issue here, a review of those precedents is helpful. In *United States v. Matlock*, 415 U.S. 164 (1974), Matlock was arrested in the front yard of the house in which he lived with his partner (among others), *id.* at 166, and

subsequently "restrained in a squad car a distance from the home," *id.* at 179 (Douglas, J., dissenting). Following Matlock's arrest, his partner granted the police entry. *Id.* at 166. The Court held that, as between two co-tenants, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170.

The Supreme Court confronted a related situation in *Illinois v. Rodriguez*, 497 U.S. 177 (1990). There, the police gained entry to an apartment with the permission of one cohabitant who had apparent but not actual authority to consent to the search. *Id.* at 180. Upon entering, the police moved through the living room and proceeded to the bedroom, where they found Rodriguez asleep. *Id.* The Court ruled that a warrantless entry does not violate the Fourth Amendment if the police reasonably believe that the person who consented had the authority to do so. *Id.* at 188–89. Both *Matlock* and *Rodriguez* focused on the actual or apparent authority of a third party to consent to a search of a home; neither case squarely confronted the legality of such a search in the face of a contemporaneous objection by the defendant.

The Supreme Court addressed that issue in *Georgia v. Randolph*, 547 U.S. 103 (2006), ruling that a warrantless search of a shared dwelling cannot be justified "over the express refusal of consent by a physically present resident." *Id.* at 120. In that case, Randolph arrived at his house to find his wife speaking to the police. *Id.* at 107. When the police asked Randolph for permission to search the house, he "unequivocally refused." *Id.* Police nevertheless ignored Randolph's refusal and, on the basis of his wife's consent, proceeded to search the house. *Id.* The Court invalidated

the search, holding that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.* at 106.

In reaching its conclusion, *Randolph* was careful to preserve both *Matlock* and *Rodriguez* and, in so doing, explained that it was "drawing a fine line"—"if a potential defendant with self-interest in objecting is in fact *at the door* and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* at 121 (emphasis added). However, "[w]hether those words ['at the door'] should be taken literally . . . would seem open to question." 4 Wayne R. LaFave, Search & Seizure § 8.3(d) (6th ed. 2022).

The better reading of *Randolph* counsels that the words "at the door" should not be taken as mandatory. *See United States v. Tatman*, 397 F. App'x 152, 161 (6th Cir. 2010) (declining to place undue emphasis on *Randolph*'s reference to "the door" because *Randolph* itself did not intend that language "to be talismanic"). As the Supreme Court stated over and over in *Randolph*, a defendant need only be "physically present" to object to a search. 547 U.S. at 106, 120 (using the term "physically present" when handing down its holding).[2]

*Fernandez v. California,* 571 U.S. 292 (2014), next in this line of two-party consent cases, removes any lingering

---

[2] *See also Randolph*, 547 U.S. at 106 ("present at the scene"); *id.* at 108 ("a co-tenant who is present"); *id.* at 109 ("physically present"); *id.* at 114 ("a present and objecting co-tenant"); *id.* at 121 ("a physically present fellow tenant"); *id.* (a "fellow occupant on hand"); *id.* at 122 ("a physically present inhabitant's express refusal of consent").

doubt—physical presence is not limited to the doorway, but merely "requires presence on the premises to be searched." *Id.* at 306 (noting that, as a result, "there may be cases in which the outer boundary of the premises is disputed"). As the Colorado Supreme Court explained when examining this same issue, "the Court in *Fernandez* clarified that the requirement of physical presence is not restricted to presence at 'the threshold' of the residence." *Williams v. People*, 455 P.3d 347, 353 (Colo. 2019). *Fernandez* continued:

> The Court confronted a similar problem last Term in *Bailey v. United States*, 568 U.S. [186] . . . (2013), but despite arguments similar to those now offered by petitioner, the Court adopted a rule that applies only when the affected individual is near the premises being searched. Having held that a premises rule is workable in that context, we see no ground for reaching a different conclusion here.

571 U.S. at 306.

In *Bailey*, the Court had held that the authority to detain a person incident to the execution of a search warrant "must be limited to the immediate vicinity of the premises to be searched," 568 U.S. at 199, and offered the following guidance: that the "immediate vicinity" is not limited to the doorway or even the property lines, *see id.* at 201. Instead, courts should examine the entire context, "including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." *Id.* Accordingly, in evaluating a consent-based search, the

Colorado Supreme Court took heed of *Fernandez* and *Bailey* and held that a defendant could object from "the threshold of the premises, elsewhere on the premises, or near the premises." *Williams*, 455 P.3d at 354.

Courts applying the *Bailey* factors in detention cases also have not limited their inquiry to a "doorway rule." For example, in *United States v. Freeman*, 964 F.3d 774 (8th Cir. 2020), the court concluded that a defendant who sat in a parked car "three car lengths" from the residence was within the immediate vicinity and could be detained because he was "within the line of sight of the dwelling" and "close enough to allow easy access to the home." *Id.* at 781. Even areas not within the "lawful limits of the premises" can be within the immediate vicinity for Fourth Amendment purposes. *Id.*; *see also State v. Tripp*, 873 S.E.2d 298, 309 (N.C. 2022) (holding that a detainee was in the immediate vicinity where detained sixty yards away on a porch neighboring the premises to be searched); *State v. Davis*, 353 P.3d 1091, 1095–96 (Idaho Ct. App. 2015) (extending *Bailey* to the common area of a multi-unit, multi-building apartment complex).

Despite *Fernandez*'s explicit reference to *Bailey*'s "premises rule," the Seventh Circuit has focused exclusively on the doorway when evaluating *Randolph* challenges. First, in *United States v. Witzlib*, 796 F.3d 799 (7th Cir. 2015), the Seventh Circuit upheld a consent-based search even though the objecting defendant was standing in the driveway, and therefore not "in fact at the door." *Id.* at 802 (quoting *Randolph*, 547 U.S. at 121). And in *Jones*, the Seventh Circuit again upheld a consent-based search where the defendant was "located ten to twenty feet from the entrance of the residence." 861 F.3d at 640. The Seventh Circuit reasoned that, even if Jones had objected, "he was no longer

'standing at the door and expressly refusing consent' when the officers received . . . consent to search the residence." *Id.* at 643. The government urges us to follow the Seventh Circuit's emphasis on presence *at the door* and to hold that, because the police had lawfully removed Parkins from the doorway, he lacked the ability to object.

But the Seventh Circuit in *Witzlib* and *Jones* never analyzed or acknowledged *Fernandez*'s reliance on *Bailey* to establish a "premises rule" and define its scope. The proposed doorway rule thus ignores *Fernandez*'s clear application of *Bailey*'s "premises rule" to the co-tenant consent context. *Fernandez*, 571 U.S. at 306; *see also Williams*, 455 P.3d at 353–54. And the doorway rule is, as a result, not "workable." *See Fernandez*, 571 U.S. at 306. Under the government's view, a defendant standing in his own driveway or on his porch mere feet from the doorway could not validly object. Consider, furthermore, a potential objector standing within the curtilage—the area "immediately surrounding and associated with the home" that is treated as "part of [the] home itself for Fourth Amendment purposes." *Lundin*, 817 F.3d at 1158 (alteration in original) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). A doorway rule would seem to require that even a person standing in their curtilage is not sufficiently at "home" to lodge a valid objection.

Finally, requiring a defendant to stand "at the door" ignores the practical reality that the "threshold [consent] colloquy" may not actually take place on the threshold. *Randolph*, 547 U.S. at 121. In this case, for instance, the relevant colloquies between the officer and Parkins's girlfriend occurred in the living room. In short, ignoring *Fernandez*'s instruction that "*Randolph* requires presence on the premises" creates all kinds of practical problems,

including a dangerous and bizarre incentive to race to the doorway to lodge an objection. 571 U.S. at 306. Nothing in any of the Supreme Court's cases suggests that this incentive is necessary or that it is a good idea.

Thus, our review of the Supreme Court's co-tenant consent cases leads us to conclude that, to satisfy *Randolph*, Parkins must have both been present on the premises and expressly refused consent. *See Randolph*, 547 U.S. at 106. And a defendant need not stand at the doorway to count as being physically present—presence on the premises (including its immediate vicinity) is sufficient. *See Fernandez*, 571 U.S. at 306; *Bailey*, 568 U.S. at 201.

### 1. Physical Presence

Applying the *Bailey* factors to this case, it is clear that Parkins was well within the immediate vicinity of his apartment when he objected to the officers' presence at his apartment. Parkins objected while located down one flight of stairs and one short walkway from the entrance to his unit. *See Davis*, 353 P.3d at 1096 (stating that a "communal sidewalk" eight to ten feet from the "bottom of the stairs" leading to the apartment being searched counted as immediate vicinity). As he sat on the curb of the parking lot by the mailboxes, he was roughly twenty feet from the front window and balcony of his unit. Parkins was both within the line of sight of his apartment and close enough to have made an easy entry had the officers allowed him to return. *See United States v. Murray*, 659 F. App'x 1023, 1027 (11th Cir. 2016) (per curiam) (holding that a driveway of the property adjacent to the defendant's residence was in the immediate vicinity because of line of sight and ease of reentry). Parkins was in such close proximity to his apartment that even the officer inside heard Parkins object to the search and

immediately thereafter moved him to the police cruiser, to stop him from "running [his] mouth" and "obstruct[ing]" the investigation.

In light of the layout of the property and Parkins's close proximity to his apartment, the nearby mailboxes bordering the parking lot where Parkins was detained were part of the relevant premises. Thus, under *Randolph*, Parkins was physically present on the premises to validly object.

## 2. Express Objection

Satisfied that Parkins was physically present, we turn to whether he expressly refused consent. It is clear that he did.

A defendant's objection must be express. "[I]mplicit refusals" are insufficient. *United States v. Moore*, 770 F.3d 809, 813 (9th Cir. 2014). But both words and actions can constitute an express refusal to grant the police entry. *See Bonivert v. City of Clarkston*, 883 F.3d 865, 875 (9th Cir. 2018) (rejecting the government's argument that an express refusal must be a "verbal refusal"). In *Bonivert*, we identified two express refusals where Bonivert first "locked the side door" and then "attempted to close the back door" on the officers as they tried to gain entry to his home. *Id.*; *see also United States v. Williams*, 521 F.3d 902, 907 (8th Cir. 2008) (recognizing an express refusal where "Williams slammed the door and put the dead bolt on").

Parkins's statement ("Don't let the cops in"), which all the officers heard, was sufficiently clear to convey his objection to allowing the police to enter his apartment. A reasonable person would have understood Parkins's intent to keep the inside of his home private. Just fifteen minutes prior, Parkins had, moreover, already resisted contact with the police at his front door by attempting to pull away from

the officers and retreat into his apartment when they initiated a frisk for weapons. That resistance to the police at his doorstep further clarifies the import of Parkins's subsequent express objection—he did not want the police in his home. *See Bonivert*, 883 F.3d at 875–76 (crediting Bonivert's physical resistance to the police as they approached his home and ultimately attempted to gain entry); *see also Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005) (An occupant's "attempt to close the door . . . communicated his lack of consent to any further intrusion by the officers.").

Parkins's yell, following his *Bonivert*-like physical resistance at his doorstep fifteen minutes earlier, made clear to everyone that he did not want the police in his home. *Compare Bonivert*, 883 F.3d at 876 n.9 (defendant "engaged in affirmative conduct to prevent the police from entering his home"), *with Moore*, 770 F.3d at 813–14 (defendant "simply acquiesced" by ignoring the police, refusing to come to the door, and doing nothing to prevent the officers from entering his home). Indeed, immediately following Parkins's yell not to let the police in, the officers moved him into the police car because he was "obstruct[ing]" their investigation. That Parkins was seen to be impeding the investigation reveals that the police understood well that Parkins did not want them to enter his apartment. *See Bonivert*, 883 F.3d at 876 (noting that the police's subjective understanding that Bonivert did not want contact with them left "no doubt that Bonivert's refusal of consent was 'express'").

The government nonetheless contends that Parkins did not lodge an express objection because he never told the officers directly that he was refusing them entry. The district court accepted this argument. But no case law supports the district court's requirement that objections be directed specifically toward the officers to qualify under *Randolph*.

If anything, the case law points in the opposite direction. *See Bonivert*, 883 F.3d at 875–76.**[3]**

Thus, Parkins's statement not to let the police into the apartment expressly conveyed his objection. And the import of that statement was especially clear following, as it did, on the heels of his physical resistance at the doorway of his home. Accordingly, the consent-based search of Parkins's home was unlawful. It was conducted "over the express refusal of consent by a physically present resident." *Randolph*, 547 U.S. at 120. We reverse the district court's denial of Parkins's suppression motion concerning the apartment search.

## C. Pre-Arrest Statements

Parkins also seeks to suppress his un-*Mirandized* statements made while he was detained outside his apartment complex. We affirm the district court's denial of Parkins's suppression motion as to this claim; these statements were not a product of *Miranda* interrogation.

Only suspects who are subject to "custodial interrogation" are entitled to *Miranda* warnings. *See Miranda*, 384 U.S. at 444. Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the

---

[3] The government also argues that Parkins's objection came "too late to override [his girlfriend's] consent," citing *United States v. Stabile*, 633 F.3d 219, 225 (3d Cir. 2011), a case in which the defendant did not arrive home until after "the search had been completed." By contrast, we are satisfied that the objection in this case was sufficiently contemporaneous. Indeed, Parkins audibly objected as Officer Smith waited for Parkins's girlfriend to complete the consent form.

suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted). "[I]nterrogation 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" *Bradford v. Davis*, 923 F.3d 599, 618 (9th Cir. 2019) (quoting *Innis*, 446 U.S. at 300).

During a *Terry* stop, the police "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" without running afoul of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). "Ordinarily, the routine gathering of background biographical data will not constitute interrogation." *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981). Nor are a suspect's "[v]oluntary statements . . . considered the product of interrogation." *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (citing *Innis*, 446 U.S. at 300).

The district court determined that Parkins's detention lasted only twenty minutes, from the moment he was initially detained until he was handcuffed and placed in the back of the police car. Parkins was restrained in the police car for another thirty minutes before he was arrested and driven to the Huntington Beach Police Department jail. Because Parkins does not contend that the police asked him any questions or that he made any statements during that subsequent thirty-minute period, we focus our analysis on the first twenty minutes of his detention.

After detaining Parkins at his doorstep, the officers asked basic questions, including his name and whether he was on probation or parole. The officers then directed Parkins downstairs to "have a chat." The officers explained that they had been having "a ton of problems" with Parkins striking

their helicopter with a laser, that the helicopter's camera had recorded him that evening, and that they were "here to talk to you and tell you stop." During this exchange, the officers conducted themselves in a manner that was professional and unabusive—even friendly at times.

The remainder of the twenty minutes during which Parkins sat outside with the officers comprised periods of silence interspersed with brief exchanges. The officers asked no further questions about the laser strikes apart from asking once where Parkins's laser pointer was located. This question did no more than "confirm[] or dispel[] the officer's suspicions." *Berkemer*, 468 U.S. at 439. The officers did not resume questioning after Parkins denied that he owned one.

Importantly, Parkins re-initiated conversation multiple times, repeatedly asking the officers what was happening and what they were investigating. Each time, the officers briefly answered Parkins's question and did not ask him about the offense. "We require more than has been presented here to establish that a conversation between an officer and an accused constituted the functional equivalent of interrogation." *United States v. Foster*, 227 F.3d 1096, 1104 (9th Cir. 2000).

Because Parkins was not subject to interrogation, we do not consider whether he was in custody. We decline to suppress his pre-arrest statements under *Miranda*.

### D. Post-Arrest Jailhouse Statements

Last, we consider whether Parkins's post-arrest statements, made during his jailhouse interview, should be suppressed as fruit of the poisonous tree. The exclusionary rule bars the government from introducing evidence that has

been obtained through a violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). The rule "applies to statements and evidence obtained as a product of illegal searches and seizures." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc). The government must show that the challenged evidence is not fruit of the poisonous tree. *United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011).

We conclude that this doctrine does not apply here— under either theory advanced by the defense. Parkins's statements at the police station were not a product of the unlawful search of his apartment because the officers did not confront Parkins with the evidence obtained as a result of that search. *See id.* at 1158. Nor were his statements a product of a purportedly unlawful arrest; the police had ample probable cause to arrest Parkins before they found the laser pointer. *See New York v. Harris*, 495 U.S. 14, 19 (1990).

### 1. Fruit of the Poisonous Search[4]

In an illegal-search case, we look to whether the interrogating officers "confront the suspect, either physically or verbally, with the evidence that has been illegally obtained" and whether "the answers the suspect gives to officials questioning him may be influenced by his knowledge that the officials had already seized certain

---

[4] We reject the government's contention that Parkins forfeited his fruit-of-the-poisonous search argument. The issue was sufficiently raised for the district court to have ruled on it had the court deemed the search unlawful. *See Cornhusker Cas. Ins. Co. v. Kachman*, 553 F.3d 1187, 1191–92 (9th Cir. 2009). Because Parkins preserved the argument, we do not evaluate it for plain error, as the government invites us to do. *See* Fed. R. Crim. P. 52(b).

evidence." *Shetler*, 665 F.3d at 1158; *see also United States v. Green*, 523 F.2d 968, 972 (9th Cir. 1975) (holding that 400 pounds of marijuana had a "[d]e minimis" role in producing the confession at issue because the defendant had also been confronted with substantial lawfully obtained evidence); *United States v. Marasco*, 487 F.3d 543, 547–48 (8th Cir. 2007) (statements admissible because "nothing in the record" indicated that defendant was confronted with the illegally seized evidence before she made them).

During his post-arrest interview, the police told Parkins that he was in custody for shining a laser at an aircraft. When Officer Garwood asked Parkins if he owned a laser, Parkins said, "No," and then immediately, "Oh yeah, do I? I do. We have one in my house." Officer Garwood proceeded to ask Parkins what color the laser was, when was the last time he had used it, and where it was located. When Officer Garwood asked where the laser pointer was located inside his apartment, Parkins responded, "I'm sure it's in there somewhere. I don't know." After some additional questions, Parkins again admitted to owning a laser pointer. Finally, the police asked Parkins if his laser pointer had any "identifying information," if he "put anything on it that you would know it's yours." Parkins responded that he had "no clue . . . . It's a regular f------ thing that I've had for a long time. I don't know what the problem is. I don't."

The police never "confront[ed]" Parkins with the discovery of the laser pointer. *Shetler*, 665 F.3d at 1158. During the interview, the police neither presented Parkins with the physical laser pointer nor mentioned having found it. The police asked the same kinds of general questions regarding the laser pointer that they had asked Parkins prior to its discovery. None of those questions suggest knowledge gleaned from finding the laser pointer. Only Officer

Garwood's question as to whether the laser pointer had any "identifying information" suggests such knowledge. (Parkins's laser pointer had the word "Brett" etched into it.) But at that point in the interview, Parkins had already twice admitted to owning a laser pointer, and—as discussed below—his answer ("no clue") does not suggest that he suspected the search was successful.

Parkins counters that *Shetler* requires suppression here. In that case, the police conducted "extensive" illegal searches of Shetler's home that uncovered "numerous" items indicative of methamphetamine production while he was detained outside for more than five hours, watching the search unfold. *Id.* at 1158–59. We held Shetler's subsequent confession to be a product of the illegal search because the "government did not bear its burden" of showing otherwise, as the confession was not recorded. *Id.* at 1157. The government had not refuted the "likelihood" that the illegally obtained evidence was used to question Shetler. *Id.* at 1158 (speculating about what kinds of questions the police may have asked).

Here, however, the video recording of Parkins's jailhouse interview—and the inferences we can draw from it—distinguish this case from *Shetler.* We need not speculate about what questions Parkins was asked, and nothing suggests that Parkins was "influenced by . . . knowledge that the officials had already seized certain evidence." *Id.* (suppressing statements where defendant had witnessed "multiple illegal searches," including one search "using protective clothing and masks, of the garage which he knew contained extensive materials associated with methamphetamine production"); *see also United States v. Nora*, 765 F.3d 1049, 1057 (9th Cir. 2014) (suppressing pursuant to *Shetler* where statements followed "immediately

on the heels of the unlawful search of his person, which yielded marijuana and a large amount of cash").

Accordingly, we reject Parkins's *Shetler* argument, as this factual scenario aligns with *Green* and *Marasco*.

## 2. Fruit of the Poisonous Arrest

Parkins asserts, in the alternative, that his jailhouse statements must be suppressed because he would not have been arrested but for the discovery of the laser pointer; in other words, his arrest was unlawful because it arose out of the unlawful search of his home. Though Parkins did not present this argument in his instant briefing to this court, he did do so at oral argument. *See Saxton v. Hous. Auth. of Tacoma*, 1 F.3d 881, 884 n.5 (9th Cir. 1993) (addressing and rejecting an argument raised for the first time in oral argument).

Though we choose to consider Parkins's argument, *see United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992), we reject it. The police had probable cause to arrest Parkins prior to the illegal search of his home and, as Parkins himself conceded below, *Harris* thus controls. 495 U.S. at 19 (declining to exclude jailhouse statements made following an illegal search because there was probable cause to arrest).

Probable cause independent of the unlawful apartment search supported Parkins's arrest. Using the helicopter's thermal camera, Officer Garwood observed a suspicious individual in the same vicinity as the laser strikes enter the apartment. That individual strongly resembled Parkins. Additional facts discovered during Parkins's ensuing detention (and before the discovery of the laser pointer) transformed reasonable suspicion into probable cause. Parkins appeared nervous as soon as the officers initiated

contact with him. Five minutes into Parkins's detention, Officer Smith confirmed via radio that the car Officer Garwood had seen Parkins unlock was registered to Parkins's girlfriend. Lastly, at least one person in the apartment complex came up to the police and referred to Parkins as the "laser pointer guy" during the investigation. Thus, Officer Garwood's initial observations, combined with the additional facts gathered by the officers on the ground, constituted probable cause to arrest Parkins even without the laser pointer.

Accordingly, *Harris* controls. 495 U.S. at 17 (declining to exclude station house statement following an arrest made in violation of *Payton v. New York*, 445 U.S. 573 (1980), but with probable cause). Following *Harris*, we have determined that "the presence of probable cause to arrest has proved dispositive when deciding whether the exclusionary rule applies to evidence or statements obtained after the defendant is placed in custody." *Crawford*, 372 F.3d at 1056.[5] We also have stated that "the rationale and holding of *Harris* are not limited to the context of *Payton* violations." *Id.* at 1058 (applying *Harris* to a presumptively unlawful parole search).

Consequently, we decline to suppress post-arrest statements made following a *Randolph* violation, as long as the arrest was independently supported by probable cause. And here, the police had probable cause to arrest Parkins prior to—and independent of—their unlawful search of his

---

[5] While the presence of probable cause may generally be dispositive when evaluating whether to suppress fruit of an illegal detention, *see Crawford*, 372 F.3d at 1056, suppression claims based on an illegal search require analysis of the two additional considerations laid out in *Shetler*, 665 F.3d at 1157, as previously discussed.

home. Therefore, Parkins's jailhouse statements were not "an exploitation of the illegal entry into [his] home." *Harris*, 495 U.S. at 19.

## III.  CONCLUSION

In sum, though we affirm the district court's refusal to suppress any of Parkins's statements, we reverse its ruling concerning the search of the apartment.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**